[No. H009744. Sixth Dist. Oct. 12, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
DEAN JULIUS ADAMS, Defendant and Appellant.

## COUNSEL

Mark D. Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Sharon G. Birenbaum, Stan M. Helfman and Christopher W. Grove, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PREMO, Acting P. J.**—Appellant Dean Julius Adams was convicted of multiple counts of sexual assault with various enhancements. He was sentenced to a term of 59 years in state prison. He raises four issues on appeal: (1) the conviction was based on partially false testimony; (2) the provision of Penal Code section 868.5 for "support persons" for sexual assault victims is unconstitutional;[1] (3) the trial court's instruction on "acting in concert" misstated the law by implying that "aiding and abetting" was synonymous with "acting in concert"; and (4) there was sentencing error. We agree there is sentencing error, modify the judgment, and affirm.

### FACTS

On October 20, 1990, 16-year-old Jamie M. got off work 2 hours early at the Taco Bell in Gilroy. Her father was not home to receive her telephone call to pick her up, so she stayed at the Taco Bell to eat.

While she was eating, she saw appellant, a coworker, and Santiago Ponce, one of the managers, drive up. Jamie enjoyed a mild on-the-job flirtation with appellant, "[l]ike bumping into him, teasing, joking around. [¶] [ ] [I]f I was passing by, I would kind of nudge him to the side." Jamie also flirted with other people, but she ignored Ponce's overtures "[b]ecause he was my manager, and because I had known he was married."

Jamie's conduct caused appellant to respond. He testified that he thought that she was "interested in [me] in a boy-girl type of situation" and he was "interested" in a "relationship" with her ever "[s]ince I met her . . . ." Two days before the incident, "she actually grabbed my bottom."

Appellant engaged in titillating conduct also. On one occasion during a discussion of tattoos, Jamie testified, appellant "pulled his pants down to show us." The tattoo was "pretty close to his groin." It said "love" and "had an arrow pointing to his penis."[2]

On October 20th, Ponce and appellant had gotten off work about 6 p.m. They spent two hours at a nearby pizza parlor drinking two or three pitchers

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

[2] Jamie testified that she turned away and never mentioned it again. Appellant, however, testified that once when Jamie was off duty, she spent hours at the Taco Bell with two friends, "waiting for me to get off." She asked appellant if he did anything after work besides drink, and he told her "that's all I do afterwork is get drunk . . . . She goes, what about getting laid? And, you know, I didn't know what to say. I knew she was trying to impress her friends.

of beer, then decided to return to the Taco Bell to eat. Ponce went into the restaurant, but appellant's friend Jimmy Blanco drove up, and he and Blanco decided to try to get some marijuana. Jamie came outside, and accepted appellant's invitation to go with them on condition that they get her home before 10:30 p.m.

The three drove off, but the plan to steal some marijuana plants was frustrated "[b]ecause the guy's car was in the driveway. . . ." They returned to the Taco Bell and Jamie and appellant transferred to Ponce's car to accompany him to the pizza parlor.

Appellant and Ponce drank three or four pitchers of beer. Jamie, a diabetic who had only drunk alcohol twice before, and who had gotten intoxicated once before on two beers, drank and felt sick on five to six glasses of beer. She did not want to drink that much, but Ponce had insisted he would not take her home until she finished the beer. Other than that, the atmosphere was friendly and they joked, watched television, and played music on the juke box.

The subject of rape came up. Ponce said that "the lady who was giving the broadcast had been raped and she had not done anything about it . . . . [T]he scene changed to a guy giving, like, a live presentation type thing, and [appellant] had said that that was the guy who did it and they both started to laugh. [¶] [ ] I laughed with them."

Before they left the pizza parlor, Jamie felt "sick to [her] stomach" and "couldn't walk straight." However, she accompanied appellant to a nearby Quick Stop store to buy cigarettes. On the way there, he kissed her. She pushed him away and said "no." He said, "come on," and that he knew she "wanted it." Jamie said that she did not. When they got back to the pizza parlor, appellant asked her to go out with him. Jamie replied that she already had a boyfriend. He responded, you want a man, not a boy. Jamie did not answer. She had never hinted that she wanted to go out with appellant.

Appellant, Ponce, and Jamie left the pizza parlor around 10:30 p.m. Jamie felt light-headed and sick. She was not stable on her feet and had to be helped to the car. She told Ponce and appellant to take her home. She got into the backseat of the car, as did appellant. Then she "threw up" and "passed out." She had no idea of how long she was out, but awoke momentarily and remembered hearing appellant, who was then in the front seat,

---

[¶] [ ] [The tattoo] came up right afterwards. . . . [S]he goes, show them your tattoo. . . . I showed my arm. She said, no, the other one that says love. So I showed it to her. . . ."

telling Ponce how to get to Coyote Lake. She passed out again, woke again, and by then they were stopped.[3]

They were in an isolated, hilly area. There were no lights or other persons around. Ponce climbed into the backseat, pulled down her pants and underwear, and put three or four fingers into her vagina. Jamie was a virgin and no one had put fingers in her before. Her vagina bled. The front passenger seat was folded forward, and appellant was sitting on its back with his feet in the rear footwell, holding down her hands. He told her that if she did not "cooperate" she would be killed. Ponce "bragged" to appellant about how many fingers he put inside her. Jamie was crying and terrified and no longer felt drunk.

Ponce and appellant got back in the front seat and drove to another isolated location. Jamie was crying. Ponce and appellant got out and dragged Jamie out of the backseat. Appellant ordered her to take off her clothing but she refused. Appellant removed her clothes and "tossed" her to the ground while she kicked and screamed and tried to hold on to her pants. Ponce held down her arms while appellant raped her, then Ponce sodomized her.

Ponce and appellant withdrew a short distance and talked together, but Jamie could not hear what was said. She did not try to escape because appellant had threatened to run her down and kill her if she even tried to run away. However, when she complained that she was cold, appellant removed a work shirt from the car trunk and gave it to her.

Appellant also removed a tire iron from the trunk. Ponce testified that appellant said they ought to kill Jamie because she knew their names. At first Ponce "was going for it," but he started thinking "it's not a godly thing." He shared this thought with appellant, who responded: "God is not involved. The devil is involved right now." However, appellant contented himself with throwing the tire iron at Jamie; it landed within inches of her head.

Appellant insisted that they walk up a steep hill. He told Jamie it would kill the sperm and she would not get pregnant. Appellant testified that he had in mind taking Jamie and Ponce to a hot springs, but he did not tell them. They did not make much progress because Jamie kept falling. Appellant felt that Jamie and Ponce "didn't want to go, so they were all lugging along." "[I]t upset me that they wasn't trying. I was just going to leave them for the

---

[3]Jamie completely missed a 30- to 60-minute visit to a pool hall, an argument between appellant and a neighbor he disliked because she was suing his mother and father, and an argument between Ponce and a girl he knew. As Ponce put it, "They just argued, and we chased them around, and ended up coming back, and the cops were there, and we took off to Coyote Lake."

fucking boars to eat." Jamie testified that appellant said he would leave her there so the boars could eat her.

Jamie stopped walking, and they went back down the hill. Jamie heard Ponce saying he felt sorry for her and he wanted to take her home. Appellant said: "so do I, but I came out here to do something, and I planned to finish something that I had planned to do."

After some discussion, they drove to Ponce's motel. Jamie was in the back-seat. Ponce thought she was "like, shocked. [¶] [ ] [I]t's like she didn't think it happened, and she didn't really care no more. All she was probably thinking about was going home." Appellant told her that the motel was far away from her house, so she should not try to run away because she would only get lost. Jamie did not know that it was only a few blocks from her father's apartment in Gilroy.

At the motel, Jamie took a shower. She thought she had locked the door, but Ponce entered the bathroom. "He bit me on the cheek because I wouldn't play with him. He strangled me and threw me against the bathroom wall." Then he sodomized her.

Ponce left the bathroom and appellant entered. He told her to cooperate one more time and they would take her home. She cried and begged to be taken home immediately, but he refused.

They left the bathroom. Appellant told Ponce she wanted to "fuck." Ponce asked her if it was true, and because she was afraid, she said, "yes." She and appellant then had vaginal intercourse on the bed, but she was screaming and crying and saying "no." Afterwards, appellant put his mouth on her vagina. Ponce was in the living room. When appellant was finished, Jamie felt sick and curled up in a ball. She went into the bathroom and vomited, then cleaned up and lay down on the bed again.

Jamie asked to be taken home, but Ponce was asleep on a couch in the living room, and appellant said they had to wait until morning. Appellant also said that he could not believe he had done that, that he was sorry.

Appellant went to sleep on the bed with Jamie lying next to him. Jamie thought about leaving, but when she tried to get up, appellant would stir as though about to wake up. Jamie did get up and go to the bathroom to vomit three or four times that night, but did not wake appellant or Ponce.

They all awoke the next morning about 8 a.m. Jamie testified that "[t]hey were running around the motel room gathering clothes. [¶][ ] They said they

were going to go to the laundromat," but they also "acted normal, like nothing had happened."

Appellant and Ponce drove her home about 8:30. Appellant let her out of the car with a warning not to say anything. He said that he knew where her father worked and that he would hunt her family down and kill them all and make her suffer and kill her.

Jamie went to the manager's office to get a key to her father's apartment. She was crying and bruised and her clothes were torn and loosened from her body. The manager thought that she had been in a fight. She told him that she had been raped. He asked her if she was going to call her father at work. She said that she would. He gave her the key and called her father himself.

When John M. got Jamie's telephone call at work, he went home immediately. She was just getting out of the bathroom and was hysterical. She told him what happened. He asked her why she didn't call him from the pizza parlor. "[T]he only thing [he] could gather from the whole thing why she wouldn't call" was that she did not want him to see her drunk. However, she did not actually say that; that was just his opinion.

John M. did not have discipline problems with Jamie, and had never used corporal punishment or struck her in anger during an argument. Jamie "possibly" had a scar on her upper lip on the day of the incident, but John M. had not inflicted it. Jamie, when asked, denied that she had told appellant that it was made by a beer can her father had thrown at her. She said the mark was made by a friend's cat.

A deputy sheriff arrived and took Jamie to the hospital. She was examined by a sexual assault response team (hereafter, SART) nurse who observed fresh bruises on Jamie's face, neck, arms, back, and abdomen. Jamie's vaginal and rectal areas were very painful to the touch. The nurse observed and photographed redness, swelling, and excoriation. There was a moderate amount of serous drainage from both the vaginal and rectal areas. The nurse had to apply pressure to stop the bleeding from an abrasion at the opening of the anus before she could photograph the injuries. An abrasion in the anal area also extended into the anal sphincter. In the 55 to 60 SART examinations the nurse had performed, she had "never really seen anybody as [physically] traumatized as much as this particular case."

On the way home from the hospital, Jamie pointed out the motel room and Ponce's car to a sheriff's deputy. Ponce was arrested and evidence was collected from the room. Sperm was found on smears made from the vaginal

and rectal swabs taken during the examination, on the front, back, and crotch of Jamie's panties, and on a bed sheet and a blanket seized from Ponce's room. However, because the stains were not very strong, no conclusions as to the ABO types of the individuals who contributed the semen could be made.

Appellant left Gilroy. He telephoned a friend to say that he had gone to Los Angeles because he was in trouble and that he would not be seen or heard from for a while. He was arrested in Arizona.

Ponce pled guilty to rape in concert and received a 12-year state prison sentence. His guilty plea was not induced by promises of leniency in exchange for his testimony at trial or for any other reason. In fact, testifying cost him the half-time credits which he would have received if his confinement in prison had not been interrupted. Ponce's testimony was not affected by a letter from appellant which Ponce received before trial and which he perceived as a threat.

Appellant stood trial on charges of penetration by a foreign object in concert (§§ 289, 264.1; count 1), two counts of forcible sodomy in concert (§§ 286, subd. (d), 264.1; counts 2 and 4), two counts of forcible rape in concert (§§ 261, 264.1; counts 3 and 5) and one count of forcible oral copulation in concert (§§ 288a, subd. (d), 264.1; count 6). As to each count it was alleged that appellant kidnapped Jamie for the purpose of committing the offense. (§§ 207, 667.8, subd. (a).) In addition, the information alleged a five-year sentence enhancement for a previous conviction of a serious felony. (§§ 667, 1192.7.)

The defense maintained that Jamie consented to sexual conduct with appellant and denied that appellant aided and abetted Ponce in performing any acts to which Jamie did not consent. The defense also suggested that Jamie fabricated the charges to escape the wrath of her father. Both appellant and Ponce testified that they did not take Jamie home because she told them that she could not go home to her father drunk because her father had beaten her before and would beat her again. Appellant testified that Jamie had told him that she received the mark under her nose when her father threw a beer bottle at her in anger.

The jury found appellant guilty on counts 1 to 5, and not guilty on count 6, oral copulation. The kidnapping allegation was found not true as to count 1 and true as to counts 2 to 5. Appellant waived a jury trial on the issue of the prior serious felony conviction, and the court found the allegation true. Appellant received a sentence of 59 years. This appeal ensued.

## Contentions on Appeal

Appellant raises four issues on appeal. First, he contends that reversal is necessary because conviction was based on false evidence adduced at trial that was substantially probative on the issue of guilt.

Second, he contends that the statute providing for the presence of "support persons" is unconstitutional as a denial of due process "because it injects into the trial extra-evidentiary factors that skew the truth-finding process." He also contends that the courtroom procedure authorized by the statute tends to erode the presumption of innocence, and that it violates the confrontation clause both by interfering with the jury's observation of the demeanor of the witness, and by injecting a factor designed to skew the jury's perception of the witness's demeanor favorably to the prosecution. In addition, appellant contends that even if the statute is not unconstitutional per se, it was unconstitutional as it was applied in his case.

Next, appellant contends that the pattern jury instructions on "acting in concert" misstate the law by rendering "aiding and abetting" synonymous with "acting in concert." Finally, appellant contends that sentence on one of the kidnapping enhancements must be stayed pursuant to section 654.

## False Evidence

Appellant brought a motion for a new trial based on the use of false evidence to obtain a conviction. The problem came to light when the district attorney telephoned Jamie after the verdicts to tell her the outcome.

As recounted in defense counsel's moving papers, Jamie told the district attorney "that she had lied about the 'cat scratch'. . . . [H]er father had in fact struck her with a beer can or beer bottle and had caused the injury . . . . [S]he had in fact told [appellant] of the incident where her father had injured her. . . . [A]fter her father had testified, she went to lunch with him and he raised the subject of the injury as well as the subject of defense counsel's questions of him concerning that injury. . . . [T]he conversation with her father influenced her and she lied about her injury in order to protect her father."

Both Jamie and her father testified at the motion for a new trial out of each other's presence. Jamie's testimony established the facts set forth in appellant's motion. She also disclosed a second instance of paternal violence. A month after the incident but before the trial, she locked her father out of her room and laughed at him. When she opened the door, he grabbed her around

the neck and shook her once or twice and threw her on the bed. She thought he wanted to scare her and he did.

Jamie stated that after talking to her father at lunch, she felt "a little" uncomfortable with him sitting behind her while she testified. If he had not been sitting behind her, she would have told the truth about the cut. However, she did tell the truth about the sexual assaults.

John M. equivocated about hitting Jamie. He explained that he did not feel that he had hit Jamie because "[m]y hand wasn't connected to the can. . . ." He denied the second act of violence, although he finally stated "there is a possibility I could have. . . . I can't say one way or the other." He denied that Jamie said that she would have to lie about the incident also.

▆▆▆ Appellant contends that since his defense at trial was consent, evidence of John M.'s conduct and its effect on Jamie, "if believed, would have established a motive on Jamie's part for staying out voluntarily with appellant and Ponce." Defense evidence that Jamie's father was violent toward her and that she feared him was unfairly refuted, however, by the false testimony of Jamie and her father. This allowed the prosecution to "present[ ] a picture of a close father-daughter relation, in which Jamie was always responsible in informing her father of her activities. The picture was buttressed by [John M.'s] remaining in the courtroom as Jamie's 'support person' (Pen. Code, § 868.5), sitting next to her in front of the jury while she testified," and by the prosecutor's statement in opening argument "that [John M.] would be there to help Jamie 'emotionally.' "

## 1. *Scope of Review*

▆▆▆ Respondent urges that this court review the denial of the motion for a new trial on an abuse of discretion standard; appellant urges an independent review; and both appellant and respondent agree that the trial court was called upon to resolve the questions whether there was false evidence which was substantially material on the issue of guilt, and if so, whether use of that evidence was prejudicial. (*In re Wright* (1978) 78 Cal.App.3d 788, 807-811 [144 Cal.Rptr. 535].)

On an analogous claim, a reviewing court has stated: "The respective role of the trial court in passing upon a claim of jury misconduct and of an appellate court in reviewing an order denying a motion for new trial for jury misconduct may be briefly stated: It is the trial court's function to resolve conflicts in the evidence, to assess the credibility of the declarants, and to evaluate the prejudicial effect of the alleged misconduct. [Citations.] A

denial of a motion for new trial grounded on jury misconduct implies a determination by the trial judge that the misconduct did not result in prejudice. [Citation.] Consistent with the principle that a trial judge has wide discretion in ruling on a motion for new trial, an appellate court should accord great deference to a trial judge's evaluation of the prejudicial effect of jury misconduct. [Citation.] However, in reviewing an order *denying* a motion for new trial based on jury misconduct, as distinguished from an order *granting* a new trial on that ground, a reviewing court has a constitutional obligation (Cal. Const., art. VI, § 13) to review the entire record, including the evidence, and to determine independently whether the act of misconduct, if it occurred, prevented the complaining party from having a fair trial. [Citations.]" (*Andrews* v. *County of Orange* (1982) 130 Cal.App.3d 944, 954-955 [182 Cal.Rptr. 176].)

Appellant's motion for a new trial claimed a violation of his federal constitutional right to a fair trial just as a claim of jury misconduct would. Consequently, we will follow the protocol of independent review. (See also *People* v. *Wisley* (1990) 224 Cal.App.3d 939, 947 [274 Cal.Rptr. 291].)

### 2. *Applicable Law*

"In *Napue* v. *Illinois* [(1959)] 360 U.S. 264 [3 L.Ed.2d 1217, 79 S.Ct. 1173], the Supreme Court . . . [i]n commenting on the use of false testimony . . . stated that the principle that the state may not make knowing use thereof 'does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.' (*Id.* at p. 269.)" (*People* v. *Ruthford* (1975) 14 Cal.3d 399, 407 [121 Cal.Rptr. 261, 534 P.2d 1341, A.L.R.4th 3132].)

The defendant must make a showing of substantial materiality; however, reversal is not required if the prosecution establishes the failure to disclose was harmless beyond a reasonable doubt. (*In re Wright, supra,* 78 Cal.App.3d at p. 814.)

"An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered . . . ; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." (*Coy* v. *Iowa* (1988) 487 U.S. 1012, 1021-1022 [101 L.Ed.2d 857, 867-868, 108 S.Ct. 2798].)

In the instant case, the false evidence is substantial material evidence going to Jamie's and John M.'s credibility, to Jamie's motive to fabricate the charges to explain her all-night absence, and to impeach appellant's and Ponce's credibility.

Therefore, after we excise the testimony of Jamie and her father, we must determine whether the remaining evidence establishes the three crimes (penetration by a foreign object, rape, and sodomy), the "in concert" allegations, and the kidnapping enhancements.

### 3. Examination of the Evidence

"The corpus delicti is established when it is proved a crime has been committed by someone. The corpus delicti consists of two elements: (1) the injury or loss or harm and (2) a criminal agency causing them to exist." (*People* v. *Jeff* (1988) 204 Cal.App.3d 309, 339 [251 Cal.Rptr. 135].)

Penetration by a foreign object is accomplished by a person "who causes the penetration, however slight, of the genital or anal openings of any person or causes another person to so penetrate the defendant's or another person's genital or anal openings for the purpose of sexual arousal, . . . by any foreign object, . . . when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury . . . ." (§ 289, subd. (a).)

Ponce admitted inserting three or four fingers into Jamie's vagina, and appellant testified to observing this. A finger is a "foreign object" within the meaning of this section. (*People* v. *Wilcox* (1986) 177 Cal.App.3d 715, 717 [223 Cal.Rptr. 170].) In addition, the SART nurse testified to and identified photographs of internal vaginal swelling, bruising, and abrasions, and pooled blood. This court has obtained and examined these exhibits. The evidence supports the inference that the act was accomplished against Jamie's will and by the use of force. (Appellant's and Ponce's testimony which establish use of force, lack of consent, acting in concert, and kidnapping in connection with all counts will be discussed below.)

"Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . . [¶] [ ] (2) Where it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury . . . ."(§ 261, subd. (a).) Appellant admitted two instances of vaginal intercourse; but claimed consent. Ponce testified he observed them.

"Sodomy is sexual conduct consisting of contact between the penis of one person and the anus of another person. . . ." (§ 286, subd. (a).) Both

appellant and Ponce denied sodomizing Jamie, and appellant denied seeing Ponce sodomize her. However, penetration may be established by circumstantial evidence. (*People* v. *Singh* (1928) 93 Cal.App. 32, 35 [268 P. 958].) Sperm was present in Jamie's rectum as well as her vagina, she was bleeding in the rectum, and there were abrasions a few centimeters inside the rectum as well as injuries to the anal sphincter. The internal injuries had to be made by something scraping or scratching the tissue. There were also injuries to the area between the vagina and the anus which occur "when the penis is going into the vagina or anus." The combination of sperm in the rectum plus injuries is circumstantial evidence from which penetration by a penis may be inferred. (Cf. *People* v. *Morales* (1989) 48 Cal.3d 527, 553 [257 Cal.Rptr. 64, 770 P.2d 244].)

The fact that this evidence does not establish which of the two offenders was the actual perpetrator of the acts of sodomy is immaterial. Not only was appellant prosecuted on an aiding and abetting theory on the two sodomy counts, but all charges were prosecuted with "in concert" allegations.

Acting in concert occurs when "the defendant, voluntarily acting in concert with another person, by force or violence and against the will of the victim, . . . either personally *or by aiding and abetting the other person*," commits rape, penetration with a foreign object, or sodomy. (§§ 264.1, 286, subd. (d), italics added.) ■ The " 'acting in concert language' [covers] *both* the person who committed the physical act and the person who aided and abetted." (*People* v. *Lopez* (1981) 116 Cal.App.3d 882, 886 [172 Cal.Rptr. 374].) The purpose of proscribing "in concert" conduct is to protect against gang sexual assault. (*People* v. *Calimee* (1975) 49 Cal.App.3d 337, 341 [122 Cal.Rptr. 658].) "It also exhibits a legislative recognition that [sexual assault] is even more reprehensible when committed by two or more persons. [Citation.]" (*People* v. *Jones* (1989) 212 Cal.App.3d 966, 969 [260 Cal.Rptr. 853].)

Courts have sustained "in concert" findings when two men "wearing ski masks or knit caps over their heads, together entered [the victim's] home and successively raped the victim, each in the presence of the other" (*People* v. *Jones, supra*, 212 Cal.App.3d at p. 969), and when one assailant held the victim's arm while the other committed the act of rape (*People* v. *Wheeler* (1977) 71 Cal.App.3d 902, 906 [139 Cal.Rptr. 737]).

■ "Kidnapping" occurs when a person "forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into . . . another part of the same county. . . ." (§ 207.)

And, " 'consent' shall be defined to mean positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved. . . ." (§ 261.6.)

Evidence negating consent and showing the use of force included considerable physical evidence: Jamie had fresh scratches and bruises all over her body and a bite on her face. Moreover, there was the testimony of the apartment manager ("she looked like she had been in a fight"), the deputy sheriff, and the SART nurse about Jamie's physical appearance and emotional condition the morning after the assault.

More damning yet, however, is the testimony of the assailants themselves.

To start, appellant's testimony places him at the locations of all the acts charged and puts him in control of "this expedition." He admitted directing Ponce to drive the car to both locations at the lake and back to the motel. He directed Ponce to get into the backseat with Jamie so she would "remain warm, if you've understood that," and to get out of the car. Appellant admitted they both pulled Jamie out of the car at the second location at the lake and that he undressed her. He gave Jamie the choice to "either have Jimmy [Ponce] or you can get the fuck out and walk home," when they were eight to ten miles from a road with any traffic on it, and he admitted that " 'she submitted to it. . . .' " Finally, appellant admitted that more than once Jamie asked to be taken home.

For his part, Ponce admitted that Jamie never gave him consent to put his fingers in her or to have sexual intercourse with her. Ponce admitted obeying appellant's instructions on where to drive, to get into the car with Jamie, and to get out of it. During the events of the evening, Jamie repeatedly told them to stop the sexual conduct, and repeatedly said she wanted to go home. Ponce admitted that Jamie was forced to have sex with appellant because "I was holding her down while he was trying to have intercourse with her."

That night at the motel, Ponce slept on a couch in the living room by the door from the living room to the bedroom. The only door to the outside was in the living room. The next morning, Ponce and appellant had a conversation about "getting out of town." They finally took Jamie home, but appellant left her with the admonition to be quiet or he would kill her and her family.

We conclude that this evidence firmly establishes that appellant and Ponce acted in concert, that they kidnapped Jamie in moving her from one location

to another, and that Jamie did not participate in the sexual acts because she consented.

Nevertheless, appellant asserts that because the jury believed Jamie's characterization of the events as nonconsensual and disbelieved his claims that the acts between him and Jamie were consensual, that he did not know what Ponce was doing, and that Jamie did not ask to be taken home, use of the false testimony cannot be found to be harmless beyond a reasonable doubt. "[H]ad the true information be[en] revealed, not only would appellant's credibility have been supported, but serious doubt would be cast on the [sic] Jamie's own versions of events."

Appellant lists several reasons why his version of the events should be accepted in preference to the prosecution's. He maintains first, that Jamie lied because she was living with her father, was subject to his control, and was afraid of his retaliation for her staying out all night. Next, appellant was unfairly impeached and Jamie was unfairly protected from impeachment by the false testimony about the facts that established Jamie's motive to lie. Finally, although Ponce's testimony was for the most part consistent with Jamie's, appellant declares this consistency understandable because Ponce was an accomplice who received favorable treatment and who had an interest in making it appear as if his admission of guilt was dispositive of the question of appellant's guilt. Therefore, appellant concludes, it cannot be said that the use of the false evidence was harmless beyond a reasonable doubt.

We disagree. The evidence, exclusive of Jamie's and her father's, is not so ambiguous that the question of consent rests on a resolution of the issue of credibility. Nevertheless, even if it did, there is strong reason in the record to resolve the issue against appellant.

Appellant's credibility was impeached by his admission of prior felony convictions of residential burglary and auto theft. Furthermore, he admitted lying on numerous occasions: he admitted answering "no" to the question whether he had ever been convicted of a felony on his Taco Bell employment application, he admitted giving a different version of his feelings about Jamie and the events of the night at his parole revocation hearing, and he admitted not telling the truth at that hearing on a number of points.

There was also substantial evidence supporting an inference of consciousness of guilt. Appellant fled to Arizona after the incident. He telephoned his friends to say he was in trouble and would be gone for a while. He admitted that he tried to persuade Ponce to refuse to testify ("I wanted him to

understand his rights"). And he sent Ponce a letter attempting to influence Ponce's testimony by "plan[ning] to do all I can to help you cause it ain't right your in prison over all her lies," if Ponce's testimony agreed with the version of events suggested in the letter, and by disclosing that "I know a lot of [C]hicano's from the north and south doing time there [Duell Vocational Institute] right now." Ponce was housed at Duell Vocational Institute when he was called back to Santa Clara County to testify.[4]

We can understand why appellant would claim that we should resolve the issue of credibility in his favor. However, appellant's display of untruthfulness on any occasion when he thought he had something to gain and his attempts to evade responsibility not only by flight but by additional criminal conduct (§ 137, inducing false testimony; § 139, threatening witnesses) are ruinous to his credibility.

Under these circumstances, with the massive array of evidence against appellant, we have no hesitation in declaring a belief that the use of false testimony was harmless beyond a reasonable doubt.

## CONSTITUTIONALITY

Next, appellant challenges the constitutionality of section 868.5, which allows prosecution witnesses in cases involving sexual and nonsexual assaults and other kinds of related conduct (see fn. 6, *post*), to be attended in the court room by two support persons, one of whom may accompany the prosecuting witness to the witness stand.[5]

Appellant challenges the procedure on two grounds. First, he claims the procedure authorized by section 868.5 is inherently prejudicial. It erodes the

---

[4]The statement refers to gang activity. Appellant agreed at trial with the prosecutor's assertion that "there are two major gang divisions of Hispanics, one from Northern California one from Southern California, and they do, in fact, kill each other[.]" However, appellant denied that the reference to "[C]hicano's" in his letter was for the purpose of "let[ting] Mr. Ponce know that you could let people know in his prison if he testified against you[.]"

[5]Section 868.5 provides: "(a) Notwithstanding any other provision of law, a prosecuting witness in a case involving a violation of [listed crimes (see footnote 6, *post*), including those charged in this case], shall be entitled, for support, to the attendance of up to two persons of his or her own choosing, one of whom may be a witness, at the preliminary hearing and at the trial, or at a juvenile court proceeding, during the testimony of the prosecuting witness. Only one of those support persons may accompany the witness to the witness stand, although the other may remain in the courtroom during the witness' testimony. . . .

"(b) If the person or persons so chosen are also prosecuting witnesses, the prosecution shall present evidence that the person's attendance is both desired by the prosecuting witness for support and will be helpful to the prosecuting witness. Upon that showing, the court shall grant the request unless information presented by the defendant or noticed by the court establishes that the support person's attendance during the testimony of the prosecuting witness would pose a substantial risk of influencing or affecting the content of that testimony. . . . In all cases, the judge shall admonish the support person or persons to not prompt,

presumption of innocence because the presence of a support person at the witness stand suggests before testimony is taken that the defendant's guilt is established. Appellant reasons that the presence of the support person impermissibly suggests that defendant is guilty before any evidence is taken. It suggests that the witness is too traumatized to face the defendant and the jury and testify without help because the crime really happened.

Appellant also contends that the support person procedure violates a defendant's due process right to a fair trial by interfering with his right to confront witnesses. It singles out one class of witness, prosecuting witnesses, for special treatment, and the special treatment injects into the trial extra-evidentiary factors that skew the truthfinding process.

Finally, appellant also claims that even if the statute is not unconstitutional on its face, it is unconstitutional as applied in this case because the support person's presence actually did influence Jamie's testimony. Appellant concludes that "the only reasonable rule is that if a support person is to attend the witness at the stand, a showing of necessity must be made in advance."

### 1. *The Statute and Its Use in This Case*

█ Section 868.5 is broad in its scope. The entitlement to support persons arises in prosecutions of 25 specified crimes which may be misdemeanors or felonies.[6] "[T]he phrase 'prosecuting witness' (as it applies to support persons) [includes] all witnesses for the prosecution" (*People v.*

---

sway, or influence the witness in any way. Nothing in this section shall preclude a court from exercising its discretion to remove a person from the courtroom whom it believes is prompting, swaying, or influencing the witness.

"(c) The testimony of the person or persons so chosen who are also prosecuting witnesses shall be presented before the testimony of the prosecuting witness. The prosecuting witness shall be excluded from the courtroom during that testimony. . . ."

[6]The statute lists sexual and nonsexual assaultive crimes and criminalized violations of certain court orders. They are murder (§ 187); mayhem (§ 203); aggravated mayhem (§ 205); kidnapping (§ 207); robbery (§ 211); assault (§ 240); battery (§ 242); assault with a deadly weapon or force likely to produce great bodily injury (§ 245); assault with intent to commit mayhem, rape, sodomy, oral copulation, rape in concert, lascivious acts upon a child, or penetration of genitals or anus with foreign object (§ 220); sexual battery (§ 243.4); rape (§ 261); spousal rape (§ 262); abusing or endangering the health of a child (§ 273a); felony infliction of corporal injury upon a child (§ 273d); felony infliction of corporal injury on a spouse or cohabitant (§ 273.5); violation of certain protective orders and judgments in spousal and child support cases (§ 273.6); in the absence of a custody order, taking a child from a person or public agency with a right to custody (§ 277); incest (§ 285); sodomy (§ 286); lewd act on a child under the age of 14 (§ 288); engaging in three or more acts of substantial sexual conduct with a child under the age of 14 (§ 288.5); oral copulation (§ 288a); anal or genital penetration by foreign object (§ 289); child molesting (§ 647.6 and former § 647a); and indecent exposure (§ 314, subd. 1). (§ 868.5, subd. (a).)

*Kabonic* (1986) 177 Cal.App.3d 487, 494 [223 Cal.Rptr. 41]), not just victims or complaining witnesses, and includes both children and adults.[7]

Prosecuting witnesses are entitled to two support persons, one of whom may accompany the witness to the witness stand. The statute does not explicitly require a showing of need for a prosecuting witness to be accompanied to the stand. However, if a person chosen to be a support person is also a prosecuting witness, the prosecution must show that ". . . the person's attendance is both desired by the prosecuting witness for support and will be helpful to the prosecuting witness." (§ 868.5, subd. (b).) If that showing is made, the court is required to grant the request unless the court notices or defendant presents information establishing "that the support person's attendance during the testimony of the prosecuting witness would pose a substantial risk of influencing or affecting the content of that testimony." (*Ibid.*) Finally, a witness support person must testify before and out of the presence of the prosecuting witness. (§ 868.5, subd. (c).)

In the instant case, appellant's objection to the use of John M. as a support person was heard in a motion *in limine*. Defense counsel informed the court that Jamie's grandmother was available (she acted as support person at the preliminary examination). Defense counsel explained: "I have concerns regarding the father, and that is because there is some indication that the complaining witness may have been abused by her father, and that could have been part or all of her motivation in reporting this incident as it was reported.

"It is my concern, if he is up there next to her, it could possibly shape her testimony in a way that would be prejudicial to my client, and I would object to that specific person being the support person for the complaining witness in this case."

"THE COURT: Objection noted. Overruled." The prosecution did not make the showing required by statute at the motion *in limine*, but at the motion for a new trial, Jamie confirmed that she had told the prosecutor that she desired her father's attendance for support and that it would be helpful to her.

At trial, John M. sat next to or behind Jamie while she was at the witness stand. The prosecutor explained John M.'s presence by telling the jurors

[7]At the time *Kabonic* was decided, section 868.5 limited support persons to prosecuting witnesses 16 years of age or younger in cases involving sexual assaults. (*People* v. *Kabonic*, *supra*, 177 Cal.App.3d at p. 492.) The phrase "prosecuting witness" was left unaltered when the section was amended three times after *Kabonic*'s holding. "In interpreting a statute of uncertain wording we presume that the Legislature is familiar with prevailing judicial interpretation of the wording and that when it has amended the statute without changing the wording it has tacitly approved prevailing interpretation. [Citation.]" (*Property Research Financial Corp.* v. *Superior Court* (1972) 23 Cal.App.3d 413, 421 [100 Cal.Rptr. 233].)

during opening argument that "the law entitles Jamie to a support person while she's here in court, and she's chosen her father . . . to help her while she is testifying, emotionally. In order to show there has been no collusion between the two, he has to testify first."

## 2. Inherent Prejudice

First, appellant complains that the support person procedure is inherently prejudicial and erodes the presumption of innocence.

"Questions of inherent prejudice arise when it is contended that 'a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process.' [Citation.] When a courtroom arrangement is challenged as inherently prejudicial, the first question is whether 'an unacceptable risk is presented of impermissible factors coming into play,' which might erode the presumption of innocence. [Citation.] If a procedure is found to be inherently prejudicial, a guilty verdict will not be upheld if the procedure was not necessary to further an essential state interest. [Citation.]" (*Coy* v. *Iowa*, *supra*, 487 U.S. at p. 1034 [101 L.Ed.2d at pp. 874-875] (dis. opn. of Blackmun, J.).)

The claim that section 868.5 was inherently prejudicial was rejected in *People* v. *Patten* (1992) 9 Cal.App.4th 1718, 1727 [12 Cal.Rptr.2d 284]. In that case, the support person apparently was not present at the stand. (*Id.* at p. 1724.) The court stated: "The statute clearly encompasses circumstances when the support persons are present in the audience section of the courtroom and without having any particular attention drawn to them. Such a procedure would result in minimal, if any, influence on a jury and would not rise to a level of possible infringement on the constitutional guarantee of due process. Thus, . . . the absence of a requirement of a case-specific showing of necessity does not . . . make this statute unconstitutional per se. This is so because procedures available to utilize support persons pursuant to the statute would not infringe any constitutional rights." (*Id.* at p. 1727.)

We agree insofar as the statute provides for the unobtrusive presence of a support person in the audience. Criminal trials are guaranteed to be public by the Sixth Amendment to the United States Constitution and by California Constitution, article I, section 15. The right is reiterated in section 686. A witness's friends, relations, counselors, etc., are as entitled to attend a public trial as anyone else whom the trial judge does not exclude for good cause. (*People* v. *Kerrigan* (1887) 73 Cal. 222, 223-224 [14 P. 849].)

Nevertheless, the defendant's right to a fair trial takes precedence over public access both in "certain classes of proceedings where danger of

prejudice is strong but case-by-case proof of its existence appears difficult" (*San Jose Mercury-News* v. *Municipal Court* (1982) 30 Cal.3d 498, 514 [179 Cal.Rptr. 772, 638 P.2d 655]), and where a defendant satisfies a court that the presence of a particular individual during all or part of a trial violates his right to a fair trial. A common example involves the exclu*sion from the courtroom of witnesses at* a trial so they cannot hear the testimony of other witnesses. (Evid. Code, § 777.)

However, even if a witness violates an exclusion order by attendance at the trial, the violation does not mean that a defendant has been denied a fair trial. The violation also "does not render the witness incompetent to testify, and does not furnish grounds to refuse permission to testify, at least where the party who seeks to offer the testimony was not 'at fault' in causing the witness's violation of the exclusion order. [Citations.]" (*People* v. *Redondo* (1988) 203 Cal.App.3d 647, 654 [250 Cal.Rptr. 46].)

■ Similarly, this statute authorizing an exception from exclusion for witness-support persons during the prosecuting witness's testimony contains adequate safeguards for the prevention of collusive testimony. (*People* v. *Redondo*, *supra*, 203 Cal.App.3d at p. 654.) Consequently, the provision of section 868.5 which allows a support person-witness to sit in the audience does not affect the presumption of innocence by bringing impermissible factors into play.

■ The procedure whereby the support person accompanies the witness at the stand is also not inherently prejudicial. "The actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny. [Citations.] Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." (*Estelle* v. *Williams* (1976) 425 U.S. 501, 504 [48 L.Ed.2d 126, 130-131, 96 S.Ct. 1691].)

Thus, the Supreme Court held that a state may not compel a defendant to wear prison clothes to trial. (*Estelle* v. *Williams*, *supra*, 425 U.S. 501.) As described by Justice William J. Brennan, Jr., in his dissenting opinion, "Identifiable prison garb robs an accused of the respect and dignity accorded other participants in a trial and constitutionally due the accused as an element of the presumption of innocence, and surely tends to brand him in the eyes of the jurors with an unmistakable mark of guilt." (*Id.* at p. 518 [48 L.Ed.2d at pp. 518-519].)

Similarly, ". . . the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, [and] the use of this

technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." (*Illinois* v. *Allen* (1970) 397 U.S. 337, 344 [25 L.Ed.2d 353, 359-360, 90 S.Ct. 1057].)

The presence of a support person at the stand does not necessarily rob an accused of dignity or brand him or her with an unmistakable mark of guilt. The presence of a second person at the stand does not require the jury to infer that the support person believes and endorses the witness's testimony, so it does not *necessarily* bolster the witness's testimony. Finally, the presence of a support person does not interfere with the decorum of the judicial proceedings. Consequently, in the absence of an articulable deleterious effect on the presumption of innocence, we must reject the contention that use of a support person at the stand deprives the defendant of a fair trial.

### 3. *Due Process and the Confrontation Clause*

Next, appellant claims that the use of a support person at the witness stand violates his due process right to a fair trial because it is a state procedure which interferes with a central aspect of the confrontation clause, namely the right of the accused to have the jury observe the witness's demeanor free from extraneous influences.

Appellant states: "The witness-stand [is] *the* place where witnesses give evidence. It is *the* place where the witness exposes himself to the jurors and submits his credibility to their judgment. To allow a comforting and hovering presence for a single witness,—the accusing witness—, effectively communicates to the jurors that the law does not quite take the presumption of innocence seriously." The support person's presence also violates due process by increasing the likelihood that a finding of guilt will be based at least in part on factors not adduced as proof rather than on evidence proved beyond a reasonable doubt.

■ The confrontation clause requires that a witness give a statement under oath and submit to cross-examination, and that the jury be able " 'to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.' [Citation.]" (*Maryland* v. *Craig* (1990) 497 U.S. 836, 845-846 [111 L.Ed.2d 666, 679, 110 S.Ct. 3157].) "[T]he right . . . to have the trier of fact observe the testifying witness" is one of the "more central[ ] confrontation interests." (*Coy* v. *Iowa, supra,* 487 U.S. at p. 1028 [111 L.Ed.2d at pp. 871-872] (dis. opn. of Blackmun, J.).)

Appellant's confrontation clause complaint focuses on jury observation of demeanor. He complains that a second person on the witness stand while a

witness is testifying interferes with the presentation of a particularly elusive but significant type of evidence, demeanor evidence.

 Demeanor evidence is relevant on the issue of credibility (see *California* v. *Green* (1970) 399 U.S. 149, 160 [26 L.Ed.2d 489, 90 S.Ct. 1930]), and jurors are to be so instructed. (§ 1127; Evid. Code, § 780, subd. (a); CALJIC No. 2.20.)

As explained by Judge Learned Hand, a witness's " 'demeanor'—is a part of the evidence. The words used are by no means all that we rely on in making up our minds about the truth of a question that arises in our ordinary affairs, and it is abundantly settled that a jury is as little confined to them as we are. They may, and indeed they should, take into consideration the whole nexus of sense impressions which they get from a witness. This we have again and again declared, and have rested our affirmance of findings of fact of a judge, or of a jury, on the hypothesis that this part of the evidence may have turned the scale." (*Dyer* v. *MacDougall* (2d Cir. 1952) 201 F.2d 265, 269, fn. omitted.)

Demeanor evidence is of considerable legal consequence. It can have a dispositive effect in the outcome of a case "in which the existence or nonexistence of a determinative fact depends upon the credibility to be given to testimonial evidence." (*Harding* v. *Purtle* (1969) 275 Cal.App.2d 396, 400 [79 Cal.Rptr. 772].) Although demeanor evidence does not appear on the record, and for that reason has led to the rule that the fact finder is the exclusive judge of credibility (*Meiner* v. *Ford Motor Co.* (1971) 17 Cal.App.3d 127, 140 [94 Cal.Rptr. 702]), many is the case which is affirmed on appeal because the reviewing court necessarily deferred to the finding of the trier of fact on issues of credibility. (See *People* v. *Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267].)

 The presence of a second person at the stand affects the presentation of demeanor evidence by changing the dynamics of the testimonial experience for the witness.

That experience—taking the oath or affirming to tell the truth, "standing in the presence of the person the witness accuses" (*Coy* v. *Iowa, supra,* 487 U.S. at p. 1020 [101 L.Ed.2d at pp. 866-867]), and speaking in front of a group of critical strangers—is expected to have a truth-inducing influence on the witness. "It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' . . . The State can hardly gainsay the profound effect upon a witness of standing in the presence of the person the witness accuses, since *that is the* very phenomenon it relies upon to establish the

potential 'trauma' that allegedly justified the extraordinary procedure [use of a screen between defendant and witness] in the present case." (*Id.* at pp. 1019-1020 [101 L.Ed.2d at pp. 865-867].) Of course, the testimonial experience may also "unfortunately, upset the truthful rape victim or abused child; but by the same token may confound and undo the false accuser, or reveal the child coached by the malevolent adult." (*Id.* at p. 1020 [101 L.Ed.2d at pp. 866-867].)

Section 868.5, subdivision (b), assumes that the support person's presence will be "helpful" to the witness while he or she is testifying. Insofar as the support person's presence actually affects the witness's performance on the stand, the witness's demeanor is affected.

Appellant observes that the preferential treatment of section 868.5 is accorded to witnesses of only one party—the prosecution. Appellant thus invites us to infer that the statute accomplishes in deed what cannot be stated to the jury in words: the unmistakably special treatment afforded to one witness conveys the message that the jury should give special consideration to the supported witness more than to any other witness.

Appellant analogizes from the principle that it is impermissible for the court to give the jury instructions that single out one witness. "When the proposed instruction focuses exclusively or primarily on the testimony of one witness, it runs afoul of a well settled corollary of the foregoing rule, i.e., that it is ' "improper for the court to single out a particular witness and to charge the jury how his evidence should be considered." ' (*People* v. *Lyons* (1958) 50 Cal.2d 245, 271 [324 P.2d 556].)" (*People* v. *Wright* (1988) 45 Cal.3d 1126, 1135, fn. 6 [248 Cal.Rptr. 600, 755 P.2d 1049].)

Appellant also asserts that the presence of the support person has a direct effect on the jury. Even the most self-effacing person receives some attention by merely being present. In the audience, the support person can be invisible to the jury. On the stand, the support person's presence is inescapable. It cannot help but distract the jury's attention from the witness and keep the jury's attention divided while both persons are at the stand. The support person's presence dilutes the jury's concentration on the witness. The support person's demeanor, as unavailable to a reviewing court as a witness's demeanor, can influence the jury in its assessment of the witness's credibility. It can thus bolster the witness's credibility and operate as unsworn opinion evidence of the truth of the charges. Finally, the support person's presence invites speculation.

That the support person's presence at the witness stand actually affects confrontation clause guarantees seems to be tacitly accepted in state court

cases treating this issue. (See Annot. (1990) 82 A.L.R.4th 1038.) The courts rely on factors discussed by the Supreme Court in confrontation clause cases in general (face-to-face confrontation, cross-examination, jury observation of the witness) (see *California v. Green, supra*, 399 U.S. at p. 158 [26 L.Ed.2d at p. 497]; *Mattox v. United States* (1895) 156 U.S. 237, 242-243 [39 L.Ed. 409, 410-411, 15 S.Ct. 337]), as well as factors raised in cases involving special procedures for child victims of sexual assault. The latter cases consider the age of the witness; the need for the procedure (closed circuit television, an interposed screen) to obtain the witness's testimony; actual evidence of prejudice to the defendant; and in support person cases, whether there is an indication that the support person influenced the testimony of the witness, and claims of influence on the jury by use of the procedure. (*Maryland v. Craig, supra*, 497 U.S. 836; *Coy v. Iowa, supra*, 487 U.S. 1012; and Annot., *supra*, 82 A.L.R.4th 1038.)

For example, in an Ohio case involving a Sixth Amendment challenge like appellant's, an eight-year-old girl was allowed to testify from her aunt's lap. The reviewing court balanced the defendant's right to confront the witness free of influence of any kind with the need to make the interrogation of the child witness effective for the ascertainment of the truth and for the protection of the witness from embarrassment. The court found that the record showed need based on the witness's exhibition of fear or embarrassment at the pretrial hearing as well as her reluctance to testify at that hearing, in addition to her demeanor at the trial (supplied for the record by the observations of the court reporter).[8] The court found that the accommodation allowed by the trial judge was a reasonable exercise of control over the mode of the interrogation of witnesses. (*State v. Johnson, supra*, 528 N.E.2d 567.)

As to the other factors raised by appellant, potential distraction is to be considered in determining whether the procedure violates the confrontation clause. However, "[d]istraction and disruption in the courtroom are not absolutes, but are to be measured objectively in the context of the circumstances presented." (*Jensen v. Superior Court* (1984) 154 Cal.App.3d 533, 542 [201 Cal.Rptr. 275].)

In regard to appellant's assertions that the support person's presence at the stand bolsters the witness's testimony and operates as unsworn opinion evidence on the truth of the charges, there is minimal support in case law for appellant's view (see Annot., *supra*, 82 A.L.R.4th 1038) although a fairly recent Hawaii case found a specific application of the procedure prejudicial.

[8]The court reporter included in the record her observations of and responses to the child witness's demeanor, for example, that she sobbed, paused, and took a deep breath. "[T]he reporter leaned out toward her and smiled at her in encouragement." (*State v. Johnson* (1986) 38 Ohio.App.3d 152 [528 N.E.2d 567, 570].)

In *State* v. *Suka* (1989) 70 Hawaii 472 [777 P.2d 240, 82 A.L.R.4th 1029], the court held that defendant was prejudiced when a 15-year-old witness was accompanied by a victim-witness counselor who stood behind the witness with her hands on the witness's shoulders while the witness testified. The victim-witness counselor's conduct bolstered the witness's credibility and the record did not establish that the procedure was necessary to obtain the complainant's testimony. The court suggested that a relative as accompanying person might have been less prejudicial because that person would more likely be seen as family support than as vouching for the witness's credibility.

In light of the fact that the dynamics of a trial are inextricably intermingled, we conclude that the procedure of allowing a witness to testify accompanied by another person at the witness stand has an effect on jury observation of demeanor.

### 4. The Permissibility of the Support Person Procedure

 Not all infringements on the confrontation clause are impermissible. "Sixth Amendment rights must be interpreted in the context of the necessities of trial and the adversary process. [Citations.]" (*Maryland* v. *Craig, supra,* 497 U.S. at p. 850 [111 L.Ed.2d at pp. 681-682].) If the state is seeking to serve a compelling interest, an interference with a constitutional right is permissible if it is narrowly tailored. (*Globe Newspaper Co.* v. *Superior Court* (1982) 457 U.S. 596, 607 [73 L.Ed.2d 248, 257-258, 102 S.Ct. 2613].)

 Consequently, we must determine whether the provision of section 868.5 which allows a prosecuting witness to testify while accompanied at the stand furthers a compelling state interest and fulfills the requirements articulated by *Coy* v. *Iowa, supra,* 487 U.S. 1012, and reiterated by *Maryland* v. *Craig, supra,* 497 U.S. 836.

The provision of section 868.5 which allows the attendance of a support person at the stand antedated both *Coy* v. *Iowa* and *Maryland* v. *Craig.* It was added in 1985 (Stats. 1985, ch. 467, § 1, pp. 1791-1792), three years before *Coy* v. *Iowa* and three years after passage of California's Proposition 8, the "Victims' Bill of Rights." Although Proposition 8 did not specifically address section 868.5, it contained the finding that "[t]he rights of victims pervade the criminal justice system . . . ." (Cal. Const., art. I, § 28.) Section 868.5 is a compatible expression of legislative concern for the supportive treatment at the stand of young witnesses while testifying.

Five years later, the voters spoke again in Proposition 115, the "Crime Victims' Justice Reform Act," approved on June 5, 1990, less than a month

before the decision in *Maryland* v. *Craig*. Again, section 868.5 was not involved. However, the preamble to the initiative contained a clear finding of fact regarding the treatment of crime victims and stated reformatory goals. The voters found "that the rights of crime victims are too often ignored by our courts and by our State Legislature." (See Criminal Law Practice After Proposition 115 (Cont.Ed.Bar. 1990) The Proposition 115 Initiative, § 1, subd. (a), p. 435.) To remedy this in part, the initiative stated a goal of creating a criminal justice system "in which crime victims and witnesses are treated with care and respect. . . ." (*Id.* at § 1, subd. (c), p. 435.)

Almost contemporaneously with the passage of Proposition 115, the Legislature deleted the 16-year-or-under age limitation of section 868.5 and added the sentence directing the judge to admonish the support person not to influence the witness and affirming the authority of the court to remove a support person who it believes is influencing a witness. (Stats. 1988, ch. 574, § 1, pp. 2107-2108 [filed with the Secretary of State on Aug. 25, 1988]; Stats. 1988, ch. 1398, § 2, pp. 4731-4732 [filed with the Secretary of State on Sept. 27, 1988].)

The current version of the statute allows support persons for both adult and child witnesses. As regards child witnesses, the state has a " ' "transcendent interest in protecting the welfare of children" ' [citation]." (*Maryland* v. *Craig, supra,* 497 U.S. at p. 855 [111 L.Ed.2d at pp. 684-685]; accord, *Hochheiser* v. *Superior Court* (1984) 161 Cal.App.3d 777, 794 [208 Cal.Rptr. 273].)

We have not, however, found any case recognizing a compelling interest in the state in protecting adult victims of sexual abuse, although ". . . revolutionary change . . . has taken place in our society, including changes with respect to the credibility and dignity we extend to adult women and children who are the victims of sexual assault." (*People* v. *Luna* (1988) 204 Cal.App.3d 726, 749 [250 Cal.Rptr. 878].)

Nevertheless, since Jamie was 17 years old at the time she testified, she arguably was a child victim of sexual assault whom the state has a compelling interest to protect.

The question remains whether the remedy to protect the compelling interest is narrowly drawn. We conclude that it is.

The purpose of the special procedure authorized by section 868.5 has always been to "minimiz[e] the trauma" to witnesses. (*People* v. *Kabonic, supra,* 177 Cal.App.3d at p. 495.) In light of the valid state concern for minor witnesses, it is much less intrusive on the jury's ability to observe the

witness's demeanor to have the witness accompanied at the stand than to have him or her testify via closed circuit television or some other means.

Nevertheless, the Supreme Court has held that the use of statutorily authorized special procedures must be based on a showing of the need of the individual witness. Use of a procedure that infringes on the confrontation clause may not be based on nothing more than a "generalized finding underlying such a statute . . . when the exception is not 'firmly . . . rooted in our jurisprudence.' [Citation.]" (*Coy* v. *Iowa*, *supra*, 487 U.S. at p. 1021 [101 L.Ed.2d at p. 867].)

Thus, the Supreme Court rejected a statute "which creates a legislatively imposed presumption of trauma." The court continued: "The exception created by the Iowa statute, which was passed in 1985, could hardly be viewed as firmly rooted. Since there have been no individualized findings that these particular witnesses needed special protection, the judgment here could not be sustained by any conceivable exception." (*Coy* v. *Iowa*, *supra*, 487 U.S. at p. 1021 [101 L.Ed.2d at p. 867].)

*Maryland* v. *Craig* teaches how specific the finding of necessity should be. "The trial court must hear evidence and determine whether use of the . . . procedure is necessary to protect the welfare of the particular child witness who seeks to testify. [Citation.] The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant. [Citations.] Denial of face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma. In other words, if the state interest were merely the interest in protecting child witnesses from courtroom trauma generally, denial of face-to-face confrontation would be unnecessary because the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present. Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimus, i.e., more than 'mere nervousness or excitement, or some reluctance to testify,' [citations]." (497 U.S. at pp. 855-856 [111 L.Ed.2d at pp. 864-865].)

Section 868.5, although amended several times since *Coy* v. *Iowa*, does not articulate the requirement of a case-specific finding of need.

Nevertheless, "the Legislature is deemed to be aware of existing laws and judicial decisions in effect at the time legislation is enacted and to have enacted and amended statutes ' "in the light of such decisions as have a direct bearing on them." ' [Citations.]" (*People* v. *Overstreet* (1986) 42

Cal.3d 891, 897 [231 Cal.Rptr. 213, 726 P.2d 1288].) The statutory history of section 868.5 shows that the statute was meant to allow support while testifying for child witnesses who suffered the types of assaults that produce profound consequences in the victims. The Supreme Court found State solicitude for witnesses in this position to be appropriate, provided there was a showing of need. Section 868.5 does not require such a showing; nor does it forbid it. Since the Legislature is deemed to have known of the requirements of *Coy* v. *Iowa*, it is consistent with the intent of the Legislature to infer that the requirement of a showing of need applies.

### 5. *Prejudice*

■ Appellant is correct that no such showing was made in his case. Nevertheless, we cannot say that appellant was prejudiced. We must test the error by the harmless beyond a reasonable doubt standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]. "An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." (*Coy* v. *Iowa*, *supra*, 487 U.S. at pp. 1021-1022 [101 L.Ed.2d at pp. 867-868].)

Once again, we disregard Jamie's testimony. In our discussion of the use of false evidence, we listed the substantial evidence of the crimes, which exists in the record separate and apart from her testimony. We conclude here, as we concluded there, that the error is harmless beyond a reasonable doubt.

### "IN CONCERT" INSTRUCTIONS

■ Next, appellant contends that the instructions on "acting in concert" misstated the law by implying that "acting in concert" is synonymous with "aiding and abetting." Because of this error, he asserts that reversal is required on the counts in which the prosecution theorized he aided and abetted Ponce, namely, count 1, foreign-object rape in concert, and counts 2 and 4, forcible sodomy in concert.[9]

The trial court instructed: "In order to prove [sodomy in concert], each of the following elements must be proved: [¶] One, a person, acting voluntarily

---

[9]Appellant states that the rape in concert instruction, CALJIC No. 10.01, "suffers from the same debility," but since appellant was alleged to be the direct perpetrator, instead of the aider and abettor, the error had no influence on the jury's deliberations.

and in concert with another person by aiding and abetting such other person engaged in an act of sodomy with a third person; and [¶] Two, the act was accomplished against the alleged victim's will by means of force or fear of immediate and unlawful bodily injury on the alleged victim. . . ." (CALJIC No. 10.21.)

"In order to prove [penetration by a foreign object in concert], the following elements must be proved: [¶] One, the defendant committed the crime of unlawful penetration by a foreign object, substance, instrument or device; and [¶] Two, the defendant did so while voluntarily acting in concert with another person; and [¶] Three, the defendant by aiding and abetting such other person, committed such crime by force or violence and against the will of the victim. . . ." (CALJIC No. 10.31.)

Appellant's complaint is directed to the CALJIC definition of "in concert" contained in each of the aforementioned instructions and which the court gave after the language just quoted. The court continued, "The phrase acting in concert means two or more persons acting together in a group sexual attack, and includes not only those who personally engage in the act constituting the crime, but those who aid and abet a person in accomplishing it."

Appellant states, "the second clause of the definition . . . is objectionable and misstates the law. [It] equates aiding and abetting, if that is the theory of liability, with acting in-concert. . . . [T]he instruction prohibits the jurors from making a separate determination of 'acting in-concert' once aiding and abetting has been found."

He continues, "Thus, in the instant case, the jury could conceivably have found that appellant aided and abetted in the acts committed by Ponce by facilitating them: i.e., by directing Ponce to Coyote Lake; by inviting Ponce into the [backseat of the] car; by helping to guard Jamie as they walked into the motel room; etc. The jury, however, need not have found that appellant acted 'in-concert' with Ponce in the sense of acting together with him in the actual commission of the sexual acts, since the evidence that appellant walked off and had no proximate involvement in the crimes committed by Ponce could be construed as a lack of concerted effort in the actual commission of the crime. This is not to say that the opposite conclusion was not possible as well, but the jury was not given an opportunity one way or other to rule on this question. . . ."

Appellant is wrong. The instructions given by the court did not remove from the jury the issue whether appellant acted in concert.

In the section on false evidence, we cited authority which stated that a defendant could act in concert either by personally committing an offense in

the course of a group sexual assault, or by aiding and abetting another to commit an offense in the course of a group sexual assault. Active participation in the commission of the sexual act is not required. (*People* v. *Jones*, *supra*, 212 Cal.App.3d at p. 969.) The jury was instructed to this effect. Appellant is correct that "[a]iding and abetting need not in every case be synonymous with 'acting in concert.'" (*People* v. *Wheeler*, *supra*, 71 Cal.App.3d at p. 906.) However, the jury instructions in this case did not equate the two. There was no error.

## MULTIPLE ENHANCEMENTS

Finally appellant complains that the trial court violated the prohibitions against multiple punishment in section 654 in imposing three-year kidnapping enhancements on both count 2 (sodomy at the second location at Coyote Lake) and count 4 (sodomy in the motel room). Appellant suggests that the trial court theorized that the asportation to the motel was a separate kidnapping.

Section 667.8 provides for a three-year enhancement if a kidnapping was committed for the purpose of effecting the sexual assault. "The statute . . . specified . . . one application of the enhancement per incident." (*People* v. *Hernandez* (1988) 46 Cal.3d 194, 203 [249 Cal.Rptr. 850, 757 P.2d 1013].)

"It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible. [Citations.] We have traditionally observed that if all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once. [Citation.]

"If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.] Although the question of whether defendant harbored a 'single intent' within the meaning of section 654 is generally a factual one, the applicability of the statute to conceded facts is a question of law. [Citation.]" (*People* v. *Harrison* (1989) 48 Cal.3d 321, 335 [256 Cal.Rptr. 401, 768 P.2d 1078].)

At sentencing, the trial court stated: "As to the five counts [of] which the defendant was convicted, they occurred at three different locations. As to the counts committed at the same location, there was more than a reasonable

opportunity for the defendant to reflect upon his conduct, but he nevertheless resumed his sexually assaultive behavior." The court also stated: "The manner in which the crimes were carried out indicates planning, and there was an admission by the defendant that he had a plan in mind, and it was his purpose to fully execute his plan on the evening involved."

In specifying the sentence on each of the four counts with a "true" finding on the kidnapping enhancement,[10] the court in each instance stated, "the jury having found the Penal Code Section 667.8 allegation to be true, three additional years are imposed." However, the court stayed the enhancement on counts 3 and 5, stating: "Execution . . . ordered stayed pursuant to Penal Code Section 654."

From the court's remarks, it appears that it did not consider whether section 654 would allow only one enhancement to be imposed because the entire incident constituted one course of conduct. (Cal. Rules of Court, rule 424.) The court, not the jury, determines the divisibility of offenses for sentencing purposes. (*People* v. *Flores* (1968) 267 Cal.App.2d 452, 459 [73 Cal.Rptr. 118].)

We turn to the court's statements to determine whether it believed appellant harbored a single criminal objective. The court mentioned that defendant "had *a* plan in mind," that he had a "purpose to fully execute his *plan*," and that he "*resumed* his sexually assaultive behavior." "Resume" means "to take up or go on with again after interruption; continue: to resume a journey." (*Random House Dictionary of the English Language* (2d ed. unabridged 1987) p. 1642.) Consequently, it appears that the court had concluded that appellant's multiple acts constituted a single course of conduct unified by a single intent.

Therefore, appellant is correct that only a single enhancement can be applied to the one incident. When multiple punishment has erroneously been imposed, the appropriate procedure on appeal is to eliminate the effect of the judgment as to the lesser offense as far as the penalty alone is concerned. (*People* v. *Cline* (1969) 2 Cal.App.3d 989, 996-997 [83 Cal.Rptr. 246].)

DISPOSITION

The judgment is modified to stay the three-year section 667.8 enhancement on count 4. The clerk of the superior court is ordered to correct the

---

[10]Counts 2 and 3 took place at the same location (the second location at Coyote Lake), and counts 4 and 5 took place at the same location (the motel).

abstract of judgment and to forward a corrected copy to the Department of Corrections. In all other respects, the judgment is affirmed.

Elia, J., concurred.

Mihara, J., concurred in the judgment only.

Petitions for a rehearing were denied November 10, 1993, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 13, 1994.