67 Cal.Rptr.3d 567 (2007)
156 Cal.App.4th 537
The PEOPLE, Plaintiff and Respondent,
v.
Lorenzo STEVENS, Defendant and Appellant.
No. A112197.
Court of Appeal of California, First District, Division Four.
October 29, 2007.
*569 Dell'Ario & LeBoeuf, Alan Charles Dell'Ario, Oakland, for Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Rene A. Chacon, Supervising Deputy Attorney General, Arthur P. Beever, Deputy Attorney General, for Respondent.
*568 REARDON, J.
A jury found appellant Lorenzo Stevens guilty as charged of assault with the intent to commit rape, sodomy, or oral copulation (Pen.Code,[1] § 220); furnishing a controlled substance to a minor (Health & Saf.Code, § 11380, subd. (a)); and administering a drug to aid in the commission of a felony (§ 222). The jury also found several aggravating factors to be true. The court sentenced appellant to an aggregate term of ten years four months in state prison, determined as follows: nine years for furnishing a controlled substance to a minor; a consecutive one-year four-month term for assault with the intent to commit rape, sodomy, or oral copulation; and a concurrent eight-month term for administering a drug to aid in the commission of a felony.
Appellant asserts that the trial court erred in (1) stationing a deputy behind appellant during his testimony; (2) violating his right to confront the victim by allowing a support person to be present *570 during the victim's testimony; and (3) erroneously sentencing him to the aggravated term for administering a controlled substance to a minor. As well, appellant maintains there is insufficient evidence to support his convictions for administering a drug to aid in the commission of a felony and furnishing a controlled substance to a minor. We affirm the judgment.

I. FACTS
On July 13, 2004, 14-year-old R.D. received a call from appellant, her father. Both parties met at a Taco Bell in Oakland and then walked to a truck where appellant was living. The windows of the truck were covered, and the windshield was dusty and obscured. R.D. entered the truck and appellant began smoking what he called "crystal" from a pipe. Appellant told R.D. to take her pants off. R.D. refused, claiming that she was menstruating. Appellant then placed a "crystal" rock in R.D.'s mouth and told her to suck on it. She took the rock out of her mouth and placed it in her bra. Appellant sucked on the left side of R.D.'s neck. Appellant pulled his pants down and instructed R.D. to orally copulate him and pulled her head down toward his penis.
R.D. managed to escape and took the bus home to her grandmother's house. While on the bus, R.D. took the rock out of her bra and put it in her purse. Once home, R.D. related what had occurred to her grandmother, Alice Beal. Beal noticed a red mark on R.D.'s neck although she had not seen such a mark on R.D. that morning. Beal took the rock from R.D. and placed it in a plastic bag. Beal called the police. Officer Valerga of the Oakland Police Department responded and took possession of the bag containing the "crystal" rock. Officers cornered appellant, who ran from police and jumped onto a roof. During the standoff with officers, appellant smoked what appeared to be crack cocaine.
Testing of the rock delivered by R.D. revealed it contained cocaine base. R.D.'s urine also tested positive for cocaine.
At trial, a support person sat next to R.D. during her testimony. The support person was introduced at trial as a victim-witness advocate. Defense counsel made no objection. A sheriffs deputy sat behind appellant throughout the trial. Counsel objected to the placement of a deputy next to appellant on the witness stand.
Appellant testified at trial, disputing the preceding facts. He claimed that R.D. went with him to his truck where he asked her for $80 and that she already had a hickey on her neck when she entered the vehicle. He denied smoking crack with her, giving her crack, pulling down his pants, sucking on her neck, or performing any lewd acts. About 30 minutes after R.D. left, appellant washed a car in the same location. While doing so, appellant was informed that R.D. had reported that he had sexually assaulted her. He called his sister and told her where he was. She arrived with R.D.'s mother and a man, and the three of them attacked appellant. As appellant ran, he saw police officers, but kept running because he was scared. He was so upset that he smoked some crack cocaine that he had purchased with the money he had received for washing the car.

II. DISCUSSION

A. The Trial Court Did Not Abuse Its Discretion in Permitting the Presence of an Armed Guard Behind Appellant While on the Witness Stand.

An Alameda County deputy sheriff sat next to appellant while he testified, in accordance with the sheriff department's policy. Counsel objected to the placement *571 of a deputy next to appellant on the witness stand. The court overruled counsel's objection, reasoning that the jurors would better focus on appellant's testimony if they were hot concerned for their safety. In rendering its decision, the court noted that one juror had already expressed discomfort from an armed police officer sitting in the witness stand. Here, the court admonished the jury to disregard appellant's custodial status.
On appeal, appellant contends that the presence of a sheriffs deputy sitting next to him while he testified "`[brand[ed]'" appellant with "`an unmistakable mask of guilt.'" We are not persuaded.
A trial court has broad discretion to maintain an orderly and secure courtroom. (People v. Hayes (1999) 21 Cal.4th 1211, 1269, 91 Cal.Rptr.2d 211, 989 P.2d 645.) Its decision regarding courtroom security measures is reviewed under an abuse of discretion standard. (People v. Ayala (2000) 23 Cal.4th 225, 253, 96 Cal. Rptr.2d 682, 1 P.3d 3.) "Where necessary to ensure an orderly trial, no denial of due process results from the mere presence of armed officers in the courtroom." (People v. Stabler (1962) 202 Cal.App.2d 862, 863-864,21 Cal.Rptr. 120.)
To support his claim, appellant incorrectly relies on the fact that he had committed no disruptions in the courtroom nor exhibited any violent behavior.[2] It is true that the imposition of physical restraints in the absence of violence or threats of violence constitutes an abuse of discretion. (People v. Mar (2002) 28 Cal.4th 1201, 1217, 124 Cal.Rptr.2d 161, 52 P.3d 95.) In this case, however, there was a deputy seated next to appellant on the witness stand. There were no physical restraints utilized against appellant. Additionally, courts have distinguished shackling from the presence of security personnel and have indicated that unless officers are present in unreasonable numbers, their presence does not need to be justified by the court or the prosecutor. (People v. Duran (1976) 16 Cal.3d 282, 291 & fn. 8, 127 Cal.Rptr. 618, 545 P.2d 1322.) Here, there was only one officer placed next to appellant during his testimony. Moreover, as explained in People v. Marks (2003) 31 Cal.4th 197, 223, 2 Cal.Rptr.3d 252, 72 P.3d 1222, "The Duran holding encompassed not only the standard positioning of officers but also their unusual deployment, as is shown by its citation to People v. David (1939) 12 Cal.2d 639, 644[, 86 P.2d 811], where a deputy drew up his chair immediately behind where the defendant was sitting. (See Duran, at p. 291, fn. 8, 127 Cal.Rptr. 618, 545 P.2d 1322.)"
The United States Supreme Court has refused to conclude that the deployment of security personnel in a courtroom during trial is an inherently prejudicial measure like shackling. (Holbrook v. Flynn (1986) 475 U.S. 560, 568-569, 106 S.Ct. 1340, 89 L.Ed.2d 525.) The court stated that "while shackling ... [is an] unmistakable indication! ] of the need to separate a defendant from the community at large, ... it is entirely possible that jurors will not infer anything at all from the presence of the guards." (Id. at p. 569, 106 S.Ct. *572 1340.) In the immediate case, appellant presented no evidence that the jurors made negative inferences about him stemming from the presence of the guard.[3] Further, the trial court admonished the jury to disregard appellant's custodial status in making their decisions. The court's motivation in placing the deputy next to appellant during his testimony was to alleviate the concerns of the jurors with respect to their safety and thus avoid distraction. Alleviating distractions was done for the express purpose of ensuring that the jury would listen to appellant's testimony rather than being consumed by safety concerns. Under these circumstances, the trial court did not abuse its discretion in following county policy in the deployment of a deputy during appellant's testimony.

B. The Presence of a Support Person During the Victim's Testimony Did Not Infringe Appellant's Right of Confrontation.

Appellant asserts that without a showing of necessity for the presence of a victim-support person while the victim testified, application of the statutory authorization for this procedure in the instant case was unconstitutional. Specifically, he maintains the procedure infringed his right of confrontation.
Appellant has waived this claim of error by failing to object to the presence of the support person or request a hearing and determination of necessity. (People v. Lord (1994) 30 Cal.App.4th 1718, 1722, 36 Cal.Rptr.2d 453.) In any event, we do not agree with his contention.
Section 868.5 authorizes a prosecuting witness in cases involving a violation of section 220 and other crimes, to select a support person who may accompany the witness to the witness stand. The statute does not require any case-specific showing that the witness needs or wants the support person, unless the support person is also a witness. (§ 868.5, subds. (a), (b).)[4] In the immediate case, the support person was asked to identify herself and her position, but did not testify for either side.
Appellant relies on People v. Adams (1993) 19 Cal.App.4th 412, 23 Cal.Rptr.2d 512 (Adams), for the proposition that a showing of need was required to warrant the presence of a support person. Appellant's reliance on this case is not persuasive. In Adams the victim's support person was her father who also testified at trial. However, no showing of need was made. (Id. at pp. 434-435, 444, 23 Cal. Rptr.2d 512.)
The court in Adams first concluded that "[t]he procedure whereby the support person accompanies the witness at the stand is ... not inherently prejudicial." (Adams, supra, 19 Cal.App.4th at p. 436, 23 Cal.Rptr.2d 512.) "The presence of a support person at the stand does not necessarily rob an accused of dignity or brand him or her with an unmistakable mark of guilt. The presence of a second person at the stand does not require the jury to infer that the support person believes and endorses the witness's testimony, so it does not necessarily bolster the witness's testimony. Finally, the presence of a support person does not interfere with the decorum of the judicial proceedings. Consequently, *573 in the absence of an articulable deleterious effect on the presumption of innocence, we must reject the contention that use of a support person at the stand deprives the defendant of a fair trial." (Id. at p. 437, 23 Cal.Rptr.2d 512.)
Second, although the Adams court concluded that the procedure permitting a witness to testify accompanied by a support person did implicate a defendant's confrontation rights, because it had an effect on the jury's observation of demeanor, it pointed out that not all such infringements are impermissible. (Adams, supra, 19 Cal.App.4th at pp. 438-441, 23 Cal. Rptr.2d 512.) Where, as here and in Adams, the witness is a minor, the state has a transcendent compelling interest in protecting the welfare of its children and the procedure designed to protect that interest as set forth in section 868.5 is narrowly drawn. (Adams, supra, at p. 442, 23 Cal.Rptr.2d 512.) Nevertheless, the Adams court ruled there must be a case-specific showing of need for the support person procedure. (Id. at p. 444, 23 Cal. Rptr.2d 512.) In arriving at this conclusion the court relied on Coy v. Iowa (1988) 487 U.S. 1012, 1021, 108 S.Ct. 2798, 101 L.Ed.2d 857 (such showing is required to justify allowing child to testify from behind a screen) and Maryland v. Craig (1990) 497 U.S. 836, 855-856, 110 S.Ct. 3157, 111 L.Ed.2d 666 (such showing is required to justify child's testimony via one-way closed circuit television).
Craig enumerated the bundle of rights encompassed within a defendant's right of confrontation as (1) face-to-face confrontation; (2) oath; (3) cross-examination; and (4) observation by the jury of the witness's demeanor. (Maryland v. Craig, supra, 497 U.S. at pp. 845-846, 110 S.Ct. 3157; People v. Johns (1997) 56 Cal.App.4th 550, 554, 65 Cal.Rptr.2d 434.) Here, only the factor of demeanor was involved, and that, not to a significant extent. Appellant complains that the fact that the supporter was introduced as a victim-witness advocate was prejudicial, because the main issue at trial was whether she was a victim. However, there is nothing in the record, and appellant has not pointed to anything, indicating that the supporter did anything by way of gesture, physical contact with the witness, facial expression or otherwise to convey that she was vouching for the witness's credibility as opposed to providing emotional support. Moreover, the supporter did not testify and thus she did not gain any additional importance in the eyes of the jury by virtue of being a witness. We therefore conclude appellant has not demonstrated prejudice from the employment of the support person procedure in this case, or that the absence of a showing of particularized need was fatal to the valid exercise of his confrontation rights. Moreover, the record supports an implied finding of need. R.D., who was 16 years old at the time, was confronting her father and recounting the assault to strangers at trial. Indeed, the jury found true the allegation that the victim was particularly vulnerable and appellant took advantage of a position of trust or confidence to commit the crime.

C. The Evidence in This Case Was Not Removed from the Chain of Custody.

Appellant contends that his drug convictions must be reversed because there is no substantial evidence to support the chain of custody of the crack cocaine. In other words, there was insufficient evidence from which the jury could reasonably conclude that the substance tested by the prosecution was the evidence that R.D.'s grandmother gave to Officer Valerga. The proper test to determine a claim of insufficient evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. In making *574 this determination, the reviewing court must view the evidence in a light most favorable to the People and presume in support of the judgment every fact the trier reasonably could deduce from the evidence. (People v. Barnes (1986) 42 Cal.3d 284, 303, 228 Cal.Rptr. 228, 721 P.2d 110.)
Officer Valerga received the cocaine from the grandmother but he did not testify. Thus appellant contends that the officer who did testify had no personal knowledge of the chain of evidence. This argument fails because Officer Valerga was not the only person with direct knowledge of the "chain of custody." R.D. testified that appellant had given her cocaine which she placed in her bra. Later she removed it to her purse. Once she returned home she removed the cocaine from her purse and gave it to her grandmother. The grandmother testified that she put the cocaine in a plastic bag and delivered it to Officer Valerga. Sergeant O'Rourke authenticated the narcotics envelope containing the evidence and that the envelope had been sealed by Officer Valerga. The grandmother confirmed that the bag in exhibit 1B was the bag in which she placed the rock. The jury could reasonably infer from this evidence that the tested cocaine was the cocaine recovered by R.D.
Appellant next asserts that even if the cocaine were given to Officer Valerga in the bag by the grandmother, Officer Valerga did not seal the bag until seven hours after the evidence was given to him. Gaps in the chain of custody do not automatically warrant suppression: "`While a perfect chain of custody is desirable, gaps will not result in the exclusion of the evidence, so long as the links offered connect the evidence with the case and raise no serious questions of tampering.'" (People v. Catlin (2001) 26 Cal.4th 81, 134, 109 Cal.Rptr.2d 31, 26 P.3d 357.) Appellant has offered no evidence of tampering, only speculation and innuendo. The trial court properly admitted the cocaine into evidence.

D. Appellant's Sentence to the Upper Term on the Health and Safety Code Charge Was Justified.

Appellant was sentenced to an aggravated term of nine years for furnishing a controlled substance to a minor (count 2). On appeal, he contends that the court erroneously imposed the upper term sentence for this offense because it relied on some aggravating factors that were not determined by the jury.
Earlier this year in Cunningham v. California (2007) 549 U.S. ___, 127 S.Ct. 856, 166 L.Ed.2d 856, the United States Supreme Court struck down the upper term sentencing provisions of our determinate sentencing law: "Because the determinate sentencing law allocates to judges sole authority to find facts permitting the imposition of an upper term sentence, the system violates the Sixth Amendment." (Id. at p. ___, 127 S.Ct. at p. 876.) The high court also reiterated the bright-line rule that "under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence." (Id. at p. ___, 127 S.Ct. at pp. 863-864.) This bright-line jury trial rule is subject to a limited exception for the fact of a prior conviction. (Apprendi v. New Jersey (2000) 530 U.S. 466, 488-490, 120 S.Ct. 2348,147 L.Ed.2d 435.)
Our Supreme Court recently handed down its opinion in People v. Black (2007) 41 Cal.4th 799, 62 Cal. Rptr.3d 569, 161 P.3d 1130, on remand *575 from the United States Supreme Court for reconsideration in light of Cunningham v. California, supra, 549 U.S. ___, 127 S.Ct. 856. There, the court held that "so long as a defendant is eligible for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any number of aggravating circumstances in exercising its discretion to select the appropriate term by balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury.... [¶] ... Under California's determinate sentencing system, the existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term. [Citation.] Therefore, if one aggravating circumstance has been established in accordance with the constitutional requirements set forth in Blakely,[5] the defendant is not `legally entitled' to the middle term sentence, and the upper term sentence is the `statutory maximum.'" (People v. Black, supra, 41 Cal.4th at p. 813, 62 Cal. Rptr.3d 569, 161 P.3d 1130, fn. omitted.) Thus, the issue in each case, including the present case, "is whether the trial court's factfinding increased the sentence that otherwise could have been imposed, not whether it raised the sentence above that which otherwise would have been imposed." (Id. at p. 815, 62 Cal.Rptr.3d 569, 161 P.3d 1130.) Concluding, the Black court stated: "[I]mposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions." (Id. at p. 816, 62 Cal.Rptr.3d 569, 161 P.3d 1130.)
Here the trial court stated that the most significant factor in imposing the upper term on count 2 was appellant's criminal record. That record included the following convictions: felony vehicle theft; evading a police officer; battery; spousal battery; carrying a loaded firearm; resisting and delaying a peace officer (two convictions); and contempt of court (two convictions). California Rules of Court, rule 4.421(b)(2) identifies as an aggravating circumstance the fact that "defendant's prior convictions ... are numerous or of increasing seriousness." Appellant's prior convictions are numerous. (People v. Black, supra, 41 Cal.4th at pp. 818-819, 62 Cal.Rptr.3d 569, 161 P.3d 1130.) Moreover, a defendant does not have a right to a jury trial on whether such convictions are numerous or increasingly serious. (Id. at pp. 819-820, 62 Cal.Rptr.3d 569, 161 P.3d 1130.) In addition to the prior convictions, the court noted that appellant was on felony probation at the time of commission of the present offenses.
The court also cited certain factors found by the jury beyond a reasonable doubt in the bifurcated proceeding, namely (1) the victim was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)); (2) defendant took advantage of a position of trust/confidence, using his position as the victim's father to coerce her into the vehcile *576 (id. rule 4.421(a)(11)); and (3) defendant was the natural parent, adoptive parent, stepparent or foster parent of the minor (§ 1170.76).
In light of Black, it is clear that appellant's constitutional right to a jury trial was not violated by the lower court's imposition of the upper term sentence on count 2. His criminal history and the jury's findings concerning victim vulnerability and taking advantage of a position of trust based on the parental relationship are three aggravating circumstances, each of which satisfies Sixth Amendment requirements and rendered appellant eligible for the upper term.

III. DISPOSITION
The judgment is affirmed.
I concur: SEPULVEDA, J.
RUVOLO, P.J., dissenting.
I respectfully dissent from that portion of the majority's opinion finding that the trial court did not abuse its discretion in requiring a uniformed, armed deputy sheriff to sit immediately beside appellant during his testimony.
The jury's decision necessarily turned on whether it believed the version of events testified to by the victim, or by the appellanta classic "she said/he said" trial. Under the circumstances of this case, requiring appellant to testify while a uniformed, armed bailiff sat by his side on the witness stand was an abuse of discretion and resulted in a prejudicial deprivation of appellant's rights to due process guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution, and by Article I, section 24 of the California Constitution.
Appellant posed no security risk warranting the unusual move, and the fact that he was in custody because he was unable to post $45,000 bail was an inadequate reason, for this infringement of appellant's constitutional right to a fair trial. The principal justification for the court taking such an extraordinary security measure was to comply with the Alameda County Sheriffs Office preferred policy of sitting with in-custody defendants while they testify. Reflexively following this policy was an abdication of the trial judge's responsibility to make reasoned judgments about the need for unusual courtroom security, and to balance that stated need against a criminal defendant's right to a fair trial. (People v. Jackson (1993) 14 Cal.App.4th 1818, 1824-1825, 18 Cal. Rptr.2d 586 (Jackson).)
Compounding the prejudice was the additional error, waived by a failure of defense counsel to object, in allowing a "support person" (an employee of the Alameda County District Attorney's Office who was misidentified to the jury as a "victim witness advocate") to sit next to the 16-year-old victim during her testimony, without the judge making the sua sponte finding of need required by Penal Code section 868.5, and the Fifth Amendment of the United States Constitution.
In a case that was decided largely upon which witness appeared more credible to the jury, this confluence of events presented intolerably dissimilar portraits of these two witnesses. As each gave their testimony, the victim was accorded an enhanced aura of believability, while the appellant was branded "`with an unmistakable mark of guilt.'" (Holbrook v. Flynn (1986) 475 U.S. 560, 571, 106 S.Ct. 1340, 89 L.Ed.2d 525 (Holbrook).) Such a display of additional security directed at appellant necessarily conveyed a maleficent impression to the jury that the appellant was "`dangerous and untrustworthy,'" eroding the presumption of innocence to which appellant was entitled. (Id. at p. *577 569, 106 S.Ct. 1340.) Under the facts of this case, the challenged action is so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial. (Id. at pp. 571-572, 106 S.Ct. 1340.) Therefore, the judgment should be reversed, and the case returned to the trial court for further proceedings.

I.
The victim, appellant's daughter, who was 14[1] at the time of the alleged sexual assault, testified that she entered her father's truck on July 13, 2004, when he began smoking "crystal" from a pipe. He instructed her to remove her pants. When she refused, he placed a "rock" in the victim's mouth and told her to suck it. The victim testified that appellant then began to suck on her neck, pulled down his pants and instructed her to perform oral sex on him while he pushed her head towards his penis. She escaped from the truck and took the bus home to her grandmother's house, where she later reported the incident.
Appellant testified and denied the victim's version of events. He specifically denied smoking crack with the victim, giving her crack, pulling down his pants, sucking on her neck, or performing any lewd acts.
When the victim returned home on the evening of July 13, she had a hickey on her neck which the victim's grandmother had not seen earlier that day. Appellant testified, however, that she already had it when he first saw her that day, and the victim admitted that her boyfriend gave it to her. Furthermore, the victim's paternal grandmother had seen her with a hickey on her neck on a prior occasion.
The victim had a rock of cocaine in her possession, and her urine tested positive for cocaine. Appellant also was under the influence of cocaine when police found him. While consistent with the claim that appellant was the source of the drugs the victim had, it does not exclude other sources, nor does it substantiate the charge of sexual assault.
After police were notified and contacted appellant, he ran. However, appellant was already running from an attack by the victim's mother and another man who appeared on the scene shortly before police arrived. The victim's mother was carrying a stick with which to beat appellant. When the police arrived appellant continued to run because he was scared.
The defense also presented evidence of a prior occasion when the victim had made up a story that she had been stabbed in order to get her father to telephone her.
Thus, it is quite apparent that, apart from the testimony of the victim, the evidence presented at trial, although consistent with guilt, was equivocal and inconclusive. On the one hand, if the victim were believed, then appellant would be doubtlessly found guilty of the charges. On the other hand, if appellant were believed, a not guilty verdict was inevitable.
That this was a difficult and close case can be inferred from other circumstances as well. It took two and a half days to select the jury. Deliberations lasted nine and a half hours over two days. During deliberations, the jury asked for video playback equipment with which to play the videotape of the victim's interview by police. They also asked the court reporter to read back the testimony of the victim. Therefore, the state of the evidence rendered it critical for the trial judge not to allow the demeanor, and thus the credibility, *578 of either of the `two key witnesses to be enhanced or diminished unfairly.

II.

A.
Appellant was in custody at the time of trial, being unable to post the $45,000 bail earlier set by the court.[2] His only prior felony conviction was for car theft (Veh. Code, § 10851) in 2001, for which he was granted probation. There is nothing in the record indicating that appellant was a security or escape risk, or that he had a penchant for violent acting out while he was in custody, or while in the courtroom.[3]
After the prosecution rested, counsel and the trial court met to discuss several issues, including what, and how, courtroom security would be deployed if appellant testified. The following exchange occurred:
"MR. YUN [defense counsel]: Yes, Your Honor. At this point, we are coming to the close of our case. I talked to my client about possibly testifying, and I've been informed by both the Court and by the deputies in the courtroom that if my client does decide to take the witness stand, that it is the policyI'm not sure whose policy, but it is policy to have a deputy sit with him at the witness stand while my client testifies. I am going to object to that procedure if that is going to be employed.
"I believe having a deputy up on the stand with my client unduly prejudices my client. He has a right to testify at a trial, and I think by putting a deputy there is, basically, a human shackle, and I believe the case law is clear that unless there is good cause for why he eitherthe Defendant needs to be shackled or another deputy next to him, that it is againstit violates his right to fair trial and right to due process under the Federal and State Constitution[s].
"Throughout the trial, I don't think there's been any evidence that Mr. Stevens has done anything that would suggest he would in any way threaten or hurt any of the jurors, any of the court staff, or that he would in any way attempt to escape or relinquish himself from his custody status. I think he should be able to go up to the stand and testify in open court. That's what a public trial is for, for everybody to get a day in court without having a deputy there, which would suggest and communicate to the jury somehow my client was dangerous and I think that is how that could affect the jury's assessment of his credibility.
"THE COURT: Mr. Yun, as you probably notice, there's been a deputy here throughout the entire trial sitting right behind him. Having the deputy in, basically, the same proximity, I think, will be no more prejudicial than it has been to that point, and the Alameda County Sheriffs Department policy of having a deputy at the stand with an in-custody for safety purposes, or even to prevent escape, is certainly reasonable, and jurors are much more concerned about their own safety these days anyway.
"As I indicated to you in chambers, I had a juror who had indicated that that juror felt uncomfortable with a police officer *579 in full uniform with a weapon sitting at the witness stand. And I don't want the jury in any way to be distracted by any of those concerns, because the jury knows that the Defendant's in custody, and I don't want them to have that kind of a distraction when he's testifying. If he decides to testify, it's certainly in his best interest not to have the jury distracted by concerns they have of their own safety. He wants them to listen to him.
"So that will be the structure we're going to use when he takes the stand.
"Mr. Beltramo [prosecutor], do you want to say anything on the record?
"MR. BELTRAMO: I want to add that the Defendant has become agitated, outwardly agitated, in the presence of the other deputy; not these deputies, but in front of other deputies. I know it was submitted one of the jurors noting his agitation and his motions and irritability, and I think given that concern that the jury expressed, the Court's reasoning is all the more founded.
"THE COURT: Okay. Thank you, Counsel. Let me know as soon as the witness comes. I want him on the stand so I can talk to him. [¶] [Recess taken.]"

B.
Especially in today's troubled times, I have no quarrel with judicial decisions noting that the sight of multiple, armed guards in courtrooms in order to maintain law and order generally is common, and for that reason, their presence does not necessarily reflect adversely upon the character of the accused. However, ordering one of these officers to leave his or her normal position in the courtroom, escort the defendant to the witness stand, pull up a chair and sit right beside the accused in the direct sightline of the jurors, and then to sit there throughout the defendant's testimony, sends an unmistakable message to the jury that the defendant is dangerous, likely to have committed the crimes charged, or at least is not as worthy of belief as are other witnesses. Before doing so, due process demands that the trial court articulate a case-specific justification for taking this extraordinary step that outweighs its negative impact on the defendant.
I agree with defense counsel's characterization that the action taken here was akin to restraining the defendant with a "human shackle." More than 30 years ago, our state Supreme Court noted that shackling a defendant in the presence of a jury "is likely to lead the jurors to infer that he is a violent person disposed to commit crimes of the type alleged." (People v. Duran (1976) 16 Cal.3d 282, 290, 127 Cal. Rptr. 618, 545 P.2d 1322) (Duran). In addition, such restraints impair the right of the defendant to be brought before the court "with the appearance, dignity, and self-respect of a free and innocent man." (Ibid., citing Eaddy v. People (1946) 115 Colo. 488, 492,174 P.2d 717.)
The United States Supreme Court has voiced this same potential concern with regard to the deployment of security personnel inside the courtroom as well: "To be sure, it is possible that the sight of a security force within the courtroom might under certain conditions `create the impression in the minds of the jury that the defendant is dangerous or untrustworthy.' " (Holbrook, supra, 475 U.S. at p. 569, 106 S.Ct. 1340.)
In Holbrook, the defendant claimed that the presence of multiple security guards in the courtroom during his trial was "inherently prejudicial." The court disagreed that the general placement of guards in that case justified a presumption that defendant's due process right was jeopardized: "While shackling and prison clothes *580 are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence." (Holbrook, supra, 475 U.S. at p. 569, 106 S.Ct. 1340.)
However, the high court differentiated the general use of security from that directed at the defendant in a manner which diminishes the presumption of innocence, or which implies that the accused is dangerous or not inherently credible: "If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status ... they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm." (Holbrook, supra, 475 U.S. at p. 569, 106 S.Ct. 1340, italics added.) In finally rejecting the defendant's call for a presumption of prejudice whenever armed security is used in a criminal trial, the court instead suggested a "case-by-case analysis" was "more appropriate." (Ibid.)
The "distinction is critical" whether the focus of security turns away from the nature of the case, or any concerns about order inside or outside of the courtroom generally, and instead focuses on the character of the defendant. (People v. Ayala (2000) 23 Cal.4th 225, 252, 96 Cal. Rptr.2d 682, 1 P.3d 3.) Where the focus of security is on the defendant, courts must consider the need for unusual security and balance that need against the level and degree of prejudice using that security may cause to the defendant's credibility.
The majority seeks support for its contrary view by citing People v. Marks (2003) 31 Cal.4th 197, 2 Cal.Rptr.3d 252, 72 P.3d 1222 (Marks). Marks actually supports appellant's argument, and illustrates just the sort of analysis that due process requires. One of the many issues raised by the defendant in Marks was the contention that the deployment of an extra security guard "next to and slightly behind Juror No. 7" violated his due process right, among other rights. (Id. at p. 223, fn. 5, 2 Cal.Rptr.3d 252, 72 P.3d 1222.) For this reason, the defendant argued that, like the decision to shackle a defendant, trial courts must demonstrate a "manifest need" to position security near the defendant while he testifies. (Id. at p. 222, 2 Cal.Rptr.3d 252, 72 P.3d 1222.)
The Marks court concluded that, although physically restraining a defendant negatively affects the jury's perception of the defendant, as well as impairs the accused's mental faculties while testifying, "`it is entirely possible'" that the jury would not infer anything from the deployment of security forces in the courtroom, including near the defendant. Therefore, courts were not required to articulate "manifest need" justifying their decisions where to deploy marshals inside the courtroom. (Marks, supra, 31 Cal.4th at p. 224, 2 Cal.Rptr.3d 252, 72 P.3d 1222.)
In its place, it appears that the court applied the abuse of discretion standard in reviewing the lower court's decision and found, "[u]nder any standard of review, the trial court properly exercised its discretion in securing the courtroom." (Marks, supra, 31 Cal.4th at p. 224, 2 Cal.Rptr.3d 252, 72 P.3d 1222.) Indeed, this conclusion is mandated by the aggravated facts in Marks, which left no room for the defendant *581 to argue that the court abused its discretion.
Earlier in the Marks trial, both defense counsel asked that their client be physically restrained during the trial; one out of concern that the defendant might injure counsel during trial, and the other out of concern that the defendant would injure his case by committing misconduct in front of the jury. (Marks, supra, 31 Cal.4th at p. 222, 2 Cal.Rptr.3d 252, 72 P.3d 1222.) The Supreme Court also emphasized that the defendant "had attacked his own counsel in the courtroom, and his disruptive behavior and violations of court orders had led to his removal at one point." (Id. at p. 224, 2 Cal.Rptr.3d 252, 72 P.3d 1222.) In exercising its discretion, the trial court "observed the proximity of the witness stand to the jury box,[4] and reasonably concluded it would be irresponsible to leave the jury unprotected from a capital defendant with a record of violent behavior in the courtroom." (Ibid.)
Therefore, given the defendant's persistent violent misconduct throughout his trial, and the configuration of the particular courtroom that made it otherwise difficult for security to be maintained while Marks was on the witness stand, the Supreme Court concluded that the decision to post a bailiff next to the defendant (but apparently out of the direct sight of most, if not all, of the jurors) was not an abuse of discretion. Marks represents just the type of case-by-case analysis deemed "appropriate" by the United States Supreme Court in Holbrook, supra, 475 U.S. at page 569, 106 S.Ct. 1340, an approach also explicitly endorsed by our own Supreme Court as well. (People v. Jenkins (2000) 22 Cal.4th 900, 998, 95 Cal.Rptr.2d 377, 997 P.2d 1044.)
Applying an abuse of discretion standard, there can be no doubt that the trial court's decision here was error. In stark contrast to the personalized and particularized justification in Marks, there was no justification here. Rather, the trial court mechanically deferred to sheriffs department "policy" of having a uniformed, armed deputy sheriff sit with all in-custody defendants while they testified, out of a generalized concern for safety or the possibility of escape. This very type of deference has been criticized as an abuse of discretion. (Jackson, supra, 14 Cal. App.4th at pp. 1824-1825, 18 Cal.Rptr.2d 586.) As I have already noted, nothing in the record demonstrates appellant posed a security or escape risk. He had no documented violent history in or out of court. In the jury's estimation, even the crimes for which he was on trial did not involve "great violence" or "threat of great bodily harm," and did not indicate that appellant was a serious danger to society. Consequently, unlike Marks, there was no reason that security could not be maintained by deploying the deputy elsewhere in the courtroom, and not in the direct line of sight of the jury as they heard and watched appellant testify.
While the judge's ruling was difficult to decode, another reason was suggested by the trial judge for the unusual security arrangement. He expressed the belief that having an armed guard sit next to appellant would actually lessen the chance that the jurors would be distracted during his testimony. However, it is hard to see how the brief anecdote the court related *582 supported this view. Apparently, a juror[5] "felt uncomfortable with a police officer in full uniform with a weapon sitting at the witness stand." That being the case, I am mystified as to how insisting that another uniformed police officer bearing a weapon sit on the witness stand next to appellant would assuage any such discomfort. There is also at least a hint that the trial judge may have thought that this extra security would enhance the jury's concentration by allaying any concern it could have for its own safety, but there is no indication that this jury had such a concern, or that appellant posed such a risk.[6]
It was even more important in this case than in most criminal cases for the court to have made a thoughtful assessment, or balancing, of the need for such conspicuous security because (1) this was a "she said/he said" case, and (2) the trial court had already allowed the victim to testify with a "support person" by her side, an event that the court completely overlooked in assessing the need for security on the witness stand while appellant testified.[7]
The use of "support persons" during the courtroom testimony of minors in criminal cases is governed by Penal Code section 868.5. Because such use infringes on a criminal defendant's right of confrontation, particularized findings of need are constitutionally required before support persons can be allowed to accompany a witness on the stand. (Adams, supra, 19 Cal.App.4th at pp. 443-44, 23 Cal.Rptr.2d 512.)
Additionally, the use of support persons carries with it potential consequences that may be inimical to the fair assessment of the witnesses' credibility. As noted by the Adams court: "The support person's demeanor, as unavailable to a reviewing court as a witness's demeanor, can influence the jury in its assessment of the witness's credibility. It can thus bolster the witness's credibility and operate as unsworn opinion evidence of the truth of the charges." (Adams, supra, 19 Cal. App.4th at p. 439, 23 Cal.Rptr.2d 512.)
Another court described how support person usage may itself enhance the testimony of a victim witness, including "(1) the potential of influencing the jury with a subconscious message that the victim is traumatized and therefore it is more likely *583 the sexual assault occurred, and (2) the concern that the presence of a person supporting the witness may add credibility to the witness's testimonyi.e., the support person is vouching for the credibility of the witness." (People v. Patten (1992) 9 Cal. App.4th 1718, 1726, 12 Cal.Rptr.2d 284 (Patten).)
Factors that bear on the degree of influence a support person may have on the credibility of the witness include how close to the witness the support person sits while testimony is given. "[T]he closer the support person is located to the victim-witness, the higher the risk the jury might be influenced." (Patten, supra, 9 Cal. App.4th at p. 1732, 12 Cal.Rptr.2d 284.) Also, the younger the victim, the more likely the jury is to understand the need for a support person, and thus, less likely to be influenced by his or her presence. (Ibid.) In this case, the victim was 16 years old. Moreover, the fact that the support person in this case was unrelated to the victim, but instead was from the prosecutor's office, is an "important consideration" in assessing the potential impact of this device. (Id. at pp. 1731-1732, 12 Cal. Rptr.2d 284.)
The nature of the defense is also an important factor in evaluating the potential influence a support person's presence may have on the jury. Where the defense is consent, or in this case, a frank disavowal of the alleged misconduct, the credibility of the victim is crucial. (Patten, supra, 9 Cal.App.4th at pp. 1731-1732, 12 Cal. Rptr.2d 284.)
So indifferent to these concerns was the trial court that, rather than fashioning a careful statement for the jury explaining the role of the support person, it invited the prosecution to formulate his own explanation to the jury. Given this unbridled latitude, the prosecutor obliged by putting a decidedly pro-prosecution spin on his elucidation:
"THE COURT: Mr. Beltramo, for the record, do you want to identify the person next to [the victim]?
"MR. BELTRAMO: Thank you. This is Kelli Sage of our Victim Witness Program here at the DA's Office. Under the provisions of the Penal Code, the victim of a sexual assault is allowed to have a victim witness advocate at their side. I'll be talking to [the victim] about that, perhaps even Kelli about that, about what her role is, primarily to provide support for the victim."
It is no quibble to point out that Penal Code section 868.5 denominates such persons as "support persons," and the misdescription used by the prosecution, "victim witness advocate," could only have worked to compound sympathy for the victim and prejudice against appellant.
The importance of reviewing case law relating to the use of support persons rests not on that decision itself, but instead on the failure of the trial court to consider the potential consequences of that decision when it subsequently ordered, in sharp contrast to a support person, a uniformed, armed police officer to take up the same position while appellant testified.
Finally, I note that the trial court made no attempt to blunt the impact of the effect of the use of a security escort during appellant's testimony, or the use of a support person while the victim testified, for that matter. (Patten, supra, 9 Cal.App.4th at p. 1732, 12 Cal.Rptr.2d 284.) The only admonition given by the court was contained in the standard jury instructions read long after the victim and appellant had testified. Moreover, as in virtually all in-custody criminal trials, the instructions simply told the jury they were to disregard *584 appellant's custody status in deciding the case.
Therefore, taken as a whole this case presents precisely the constellation of facts presaged by the United States Supreme Court in Holbrook as one where the use of courtroom security unreasonably "create[ed] the impression in the minds of the jury that the defendant is dangerous or untrustworthy." (Holbrook, supra, 475 U.S. at p. 569, 106 S.Ct. 1340.) Where the challenged action is so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial, prejudice is presumed and no showing of actual prejudice is necessary. (Id. at pp. 571-572, 106 S.Ct. 1340.) If actual prejudice need be shown (People v. Jenkins, supra, 22 Cal.4th at p. 998, 95 Cal.Rptr.2d 377, 997 P.2d 1044), the particular circumstances of this case inescapably reveal that prejudice to appellant.
For these reasons, appellant has been convicted without being accorded due process of law, and I would reverse and remand the case for a new trial.
NOTES
[1] All further statutory references are to the Penal Code unless otherwise specified.
[2] Of course, appellant was charged with a serious sexual assault which constituted a "violent felony" within section 667.5, subdivision (c)(15). He was in custody; fled when confronted by police at the time of his arrest (although he presented a different version); and had an extensive criminal record (see pt. II.D., post). As well, during colloquy on the issue of the presence of the guard, the prosecutor noted that appellant had been "outwardly agitated ... in front of other deputies .... [I]t was submitted one of the jurors noting his agitation and his motions and irritability...." Later it was clarified that the juror was distracted by appellant's actions, but did not feel afraid or threatened by him.
[3] No effort was made by defense counsel to file juror declarations in support of a motion for new trial on the affect, if any, of the deputy's presence.
[4] Where the support person is also a prosecuting witness, "the prosecution shall present evidence that the person's attendance is both desired by the prosecuting witness for support and will be helpful to the prosecuting witness." (§ 868.5, subd. (b).)
[5] This reference is to Blakely v. Washington (2004) 542 U.S. 296, 303, 124 S.Ct. 2531, 159 L.Ed.2d 403, which defines the "statutory maximum" for purposes of Apprendi's brightline rule as "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Thus, "the relevant `statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional facts." (Blakely v. Washington, supra. 542 U.S. at pp. 303-304, 124 S.Ct. 2531)
[1] She turned 15 two days after the events described.
[2] Prior to his arrest, appellant was working for cash as a landscape laborer.
[3] Except for the single stolen vehicle conviction in 2001, other prior convictions were all misdemeanors. Even as to the convictions currently under review, the jury made special findings that (1) the crimes did not involve great violence, threats of violence, or a high degree of cruelty, viciousness, or callousness, and (2) appellant did not engage in violent conduct which would indicate that he was a serious danger to society.
[4] The trial court observed that the jury box was only about four feet from the witness stand, and in light of the defendant's prior conduct, it would be a "`total dereliction of [the court's] responsibility' to have the nearest marshal `some 30 or 40 feet away, who would have to go around tables, chairs and other people [to] get to [defendant].'" (Marks, supra, 31 Cal.4th at p. 223, 2 Cal.Rptr.3d 252, 72 P.3d 1222.)
[5] It is not at all clear from the record or from the briefs whether the juror mentioned was on this jury or on another case in the judge's courtroom.
[6] The prosecutor made some reference to "agitation" by appellant reported by an unidentified security guard, not a courtroom bailiff, and perhaps a juror noted "his agitation and his motions and irritability," but the trial court took no steps to clarify counsel's comment, and did not base its decision on this vague, off-handed comment. It was clarified later in the proceedings that the juror referred to by the prosecutor was not afraid of, or felt threatened by, appellant.
[7] I also disagree with the majority's conclusion that it was not error for the trial judge to allow a support person to sit at the side of the victim while she testified, or that it was supported by an "implied finding" of need based on the victim's age alone. (Maj. opn. at p. 573.) (See Coy v. Iowa (1988) 487 U.S. 1012, 1021, 108 S.Ct. 2798, 101 L.Ed.2d 857; People v. Adams (1993) 19 Cal.App.4th 412, 443-444, 23 Cal.Rptr.2d 512 (Adams).) It was the responsibility of the trial judge to make this determination, although the majority points out that the jury found "true" that the victim was vulnerable within the meaning of California rules of Court, rule 4.421(a)(3), for sentencing purposes. For what it is worth, the jury made inconsistent findings on this question when it also found "not true" that the victim was particularly vulnerable "due to age or significant disability," within the meaning of Penal Code section 1170.85, subd. (b). In any case, the error was waived when appellant's trial counsel failed to object before the victim began testifying. (People v. Lord (1994) 30 Cal.App.4th 1718, 36 Cal.Rpitr.2d 453.)